302 F.2d 167
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CHAIN SERVICE RESTAURANT, LUNCHEONETTE AND SODA FOUNTAIN
EMPLOYEES, LOCAL 11, AFLCIO, and Chain Service Restaurant,
Luncheonette & Soda Fountain Employees, Local 11, AFL-CIO,
Welfare Trust Fund, and Its Trustees Elmer Hauck, Arthur
Russell, William Donovan, Murray Solomon, George Papalexis,
John Leonides, Austin B. Cox. Harry Greenseid, John Murphy,
Ernest Gugenheim, Samuel Weiss, Lou Klein, James Manners,
Nathan Kolton, and Its Administrator Murray Solomon, Respondents.
 No. 255, Docket 27253.
 United States Court of Appeals Second Circuit.
 Argued March 9, 1962.
Decided April 10, 1962.
 
 Standau E. Weinbrecht, Washington, D.C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Samuel M. Singer, Attorneys, National Labor Relations Board, Washington, D.C., on the brief), for petitioner.
 Harold L. Luxemburg, New York City (Steven J. Goldsmith, New York City, on the brief), for respondent.
 Before WATERMAN, KAUFMAN and MARSHALL, Circuit Judges.
 KAUFMAN, Circuit Judge.
 
 
 1
 We have before us a petition by the National Labor Relations Board for enforcement of its orders[1] against Local 11, Chain Service Restaurant, Luncheonette & Soda Fountain Employees, AFL-CIO ('Local 11'), and the union's Welfare Trust Fund ('Fund'). The orders require Local 11 and the Fund to cease and desist from certain unfair labor practices. This proceeding is unusual for we find two unions pitted against each other with one taking an unaccustomed role as an employer charged with unfair labor practices. The respondents deny these charges with vehemence, and also contend that the Board had no jurisdiction over them. We believe these objections to the Board's orders are without merit, and therefore, grant enforcement with one minor modification.
 
 
 2
 Local 11 is one of 500 locals scattered through 40 states chartered by and affiliated with the Hotel and Restaurant Employees & Bartenders International Union, AFL-CIO. As such it is subject to provisions of the International's constitution dues and initiation fees from the locals the parent body. Under this constitution with principal offices in New York City, approve or disapprove of local charters and by-laws and can enforce discipline against locals. It also can negotiate nation-wide collective bargaining agreements on behalf of the locals. In 1958 over $250,000. was remitted to the International's offices in Ohio as per capital dues and initiation fees from the locals for their 425,000 members. Local 11, with principal offices in New York City, sent $40,000. to the International in that year on behalf of its 5,500 members.
 
 
 3
 The Fund was established in 1955 by a trust indenture which combined and continued as a single entity two pre-existing funds created for the benefit of employees represented by Local 11.
 
 
 4
 The Fund was established in 1955 by the same building as Local 11)8 it is governed by twelve trustees. Six of these trustees are deisgnated by Local 11. The remaining six are chosen by the employers who contribute to the Fund pursuant to the terms of collective bargaining agreements made with Local 11. The Fund obtains life, health, and accident insurance coverage for the employees, as well as dental, medical and hospital care, through the purchase of insurance contracts from a New York insurance company and through contracts made with local dentists, physicians, and hospitals.
 
 
 5
 These facts are not in dispute.
 
 Unfair Labor Practices
 
 6
 The Board relief on the following evidence in issuing its orders:
 
 
 7
 Local 11 employed seven women as clerical help, and the Fund employed five women to perform administrative tasks connected with its benefit program. All of these employees were represented for collective bargaining purposes by Local 153, Office Employees International Union, AFL-CIO ('Local 153').[2] Furthermore, both Local 11 and the Fund had entered into substantially similar contracts with Local 153 covering the period from January 1, 1957 to December 31, 1958. The contracts featured automatic renewal provisions which operated to extend the contracts' lives for one year periods unless either party terminated them by giving 60 day notice.
 
 
 8
 On October 6, 1958 the Business Representative of Local 153, Charles Ponti, notified Local 11 and the Fund of his union's intention to terminate the existing agreements at the end of their current term, and of his desire to meet with Local 11 and Fund officers to negotiate new ones (Gen.Counsel Exhs. 4, 9). No response to these letters was received, and in mid-December Ponti again wrote to both Local 11 and the Fund stating his desire to negotiate, this time setting forth particular contract demands. The letters concluded' Kindly contract me at your earliest convenience to discuss the above proposals' (.gen.Counsel Exhs. 5, 6).
 
 
 9
 While this correspondence was in progress, a jurisdictional dispute between Local 11 and Local 153 involving the organization of workers in Childs Restaurants came to a climax. In the previous Autust, Local 153 had informed Local 11's president Fred Ferrara that it intended to organize the cashiers and checkers at Childs. Although Alocal 11 was desirous of undertaking a similar effort because it had represented other Childs employees, Ferrara agreed not to interfere with Local 153's organization attempt after that union represented that it already had organized a substantial number of the Childs employees. It later became apparent that Local 153 had not in fact organized a substantial number of tese employees; and Local 11's officers, upon reflection, concluded that Local 153 had unfairly outmaneuvered them. Moreover, Local 11's International became interested in the dispute and instructed it to stop Local 153's organization campaign. As a result, when Local 153 on December 15, 1958 filed a representation petition seeking an election among the unrepresented cashiers and checkers at Childs, Local 11 intervened. Local 11 was unable, however, to secure sufficient employee support at Childs, and was subsequently eliminated from the representation ballot.
 
 
 10
 When Local 11 and the Fund failed to answer Ponti's request for contract negotiations, Ponti spoke to his shop stewards and asked them to try to arrange bargaining sessions. At the end of the year the existing contracts expried; but still no word was received from the employers. Then, during the first week of January (1959), Ponti was informed by the shop stewards that they had heard a rumor that Local 11 and jiFund officers were about to demand that all employees resign from Local 153.
 
 
 11
 On January 8, 1959, the Fund employees were called into the office of Fund Administrator Solomon, and were shown a document purporting to effect the resignation of all of Local 11's employees from Local 153. Solomon referred to Local 11's dispute over Childs and instructed the Fund's employees to add their signatures to the petition saying, 'I must have you girls sign this paper, because the girls downstairs signed ii' (Bd.App. 103). A fUnd employee Bernice Baruta (who had been a member of Local 153 for 20 years)8 protested that the Childs dispute had nothing to do with their membership in Local 153; but Solomon replied, 'They are taking members away from us and we are going to take members away from them.' (Ibid.) Baruta asked permission to call Local 153's Business Agent before anyone signed the petition, but this was refused. Another Fund employee asked Solomon what would be done about negotiating a new contract. She was told that the Local 11 attorneys 'would draw up the contract and (that she should) not worry about the raises and everything' (Bd.App. 104). At Solomon's insistence all of the Fund employees then signed the petition-- except Baruta.
 
 
 12
 On the next day Baruta was told to go downstairs to the Local 11 offices. There, Local 11's president Ferrara demanded that she sign the resignation petition because 'all the girls' had done so. Baruta declined and Ferrara warned her of the consequences, saying, 'Well, if you don't sign the paper, I guarantee that you will never get another job from a hotel, restaurant office' (Bd.App. 106). Ferrara also asked Baruta to resign from her job at the Fund, but she refused.
 
 
 13
 The resignation petition, signed by all of the employees of Local 11 and the Fund (except Baruta), was received by Ponti on January 12. Ponti then arranged to meet with Ferrara on January 16 to discuss the situation. At this meeting, Matthew Thompson, a Local 153 officer, asked Ferrara whether it was true that Ferrara had demanded that Local 11 employees resign from Local 153. Ferrara freely admitted that this was true, and told Thompson and Ponti, 'I called my girls together and they signed' (Bed.App. 115-116). When asked what he intended to do about Baruta, Ferrara replied that he had not yet decided. He also told Ponti in answer to the latter's request for contract negotiations that 'under the circumstances' this would not be possible. No further contract negotiations were ever held. In March, 1959 the Fund granted wage increases to its employees without giving any notice to Local 153.
 
 
 14
 The Board held that respondents, 'by sponsoring and sanctioning the circulation among their employees of a petition calling for resignation of their membership in Local 153,' violated Section 8(a)(1) of the National Labor Relations Act, as amended.[3] We believe there is in the record substantial evidence, which fully warranted the Board's findings, Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487-488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Consolidated Edison Co. of New Yoirk v. N.L.R.B., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938), and that its conclusion reflects a proper application of the law. N.L.R.B. v. Marcus Bros., 272 F.2d 253, 254 (2nd Cir. 1959).
 
 
 15
 There is uncontradicated testimony by Baruta that Administrator Solomon produced the petition (which had already been signed by Local 11 employees) and directed the Fund's employees to sign it. When Baruta refused, she was threatened not only with the looss of her job, but with blacklisting. That the threat was made by Ferrara, president of Local 11, is significant because this same official later admitted to Thompson that he had instigated the resignations of Local 11's employees as well. Ferrara's behavior, the sudden and simultaneous resignation of respondents' employees in a single petition, and the lack of de facto independence in the operation of the Fund and Local 11, justify the inference of coercion drawn by the Board.[4] We cannot say that the inference is unreasonable when these facts are viewed with the Childs Restaurant dispute in the background. Indeed, it seems quite logical. Respondents cannot prevail unless we disregard the testimony of both Baruta and Thompson, and not only believe Ferrara but resolve all doubts in his favor. We deal here with an issue of credibility, and the trial examiner who heard and saw the witnesses and the Board chose to believe Baruta and Thompson rather than Ferrara. As we have indicated before, the Court is not disposed to overturn a finding based on substantial evidence and the adjudication of credibility by a fact-trier, who observed the witnesses and chose between two discordant versions of the facts. N.L.R.B. v. Dinion Coil Co., 201 F.2d 484, 487-490 (2nd Cir. 1952); N.L.R.B. v. James Thompson and Co., 208 F.2d 743, 746 (2nd Cir. 1953).
 
 
 16
 Similarly, we hold that the Board was justified in concluding that the Fund violated Section 8(a)(1) 'by promising benefits to its employees if they would sign the petition,' N.L.R.B. v. Pallette Stone Corp., 283 F.2d 641, 642 (2nd Cir. 1960). The Board also found that Local 11 violated this same provision 'by threatening an employee with reprisal for refusing to sign the petition.' This refers to the Ferrara-Baruta incident, and since Baruta was employed by the fUnd, this unfair labor practice must be attributed to the Fund and no Local 11. Otherwise, we hold that the Board was correct. Ibid.
 
 
 17
 Finally, the Board found that Local 11 and the Fund violated Section 8(a)(5) and (a)(1) of the Act 'by refusing to bargain with Local 153 as the representative of their employees'; and additioially that the Fund violated those sections by granting unilateral wage increases to its employees in March, 1959.[5] Respondents admit[6] that this issue turns on the disposition of those already decided against them. The refusal to bargain in the fall and winter of 1958, and again in January 1959 was a blatant violation of respondents' duty to negotiate in good faith. The resignations submitted in January to Local 153 were, of course, no defense to the failure to bargain. Respondents 'could not lawfully challenge the union's majority after (they) had destroyed that majority by (their) own practices.' N.L.R.B. v. Piezo Mfg. Co., 290 F.2d 455, 456 (2nd Cir. 1961). The granting of wage increases by the Fund while it refused to bargain with the majority representative also violated these sections of the Act. Cf. May Department Stores Co. v. N.L.R.B., 326 U.S. 376, 381-386, 66 S.Ct. 203, 90 L.Ed. 145 (1945); Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).
 
 Jurisdiction
 
 18
 We have noted already that we are dealing with a case in which a labor union, in its capacity as an employer, is charged with unfair labor practices. In this connection, the Supreme Court has made it clear that 'when a labor union takes on the role of employer the Act applies to its operations just as it would to any other employer.' Office Employees International Union, Local No. 11 AFL-CIO v. N.L.R.B., 353 U.S. 313, 316, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957). In the instant case the Board, following its own precedent, Oregon Teamsters' Security Plan Office, 119 N.L.R.B. 207, 208 (1957), asserted jurisdiction over Local 11 because it was an integral part of a multi-state and non-retail enterprise (the International) which had an annual direct inflow or outflow exceeding $50,000. Siemons Mailing Service, 122 N.L.R.B. 81, 85 (1958); cf. Office Employees International Union, Local No. 11 AFL-CIO v. N.L.R.B., supra, at p. 315, 77 S.Ct. 799, 1 L.Ed.2d 846; see also The T. H. Rogers Lumber Co., 117 N.L.R.B. 1732, 1735 (1957).
 
 
 19
 Local 11 argues that the Board erred in categorizing it as part of a nonretail enterprise since its members work almost entirely in retail establishments. But, the short answer to this is that the union, to which the inflow-outflow tests are applied, is not itself in the retail 'business' although it may be servicing enterprises that are. Concededly unions are not, strictly speaking, either 'retail' or 'non-retail' as those terms are ordinarily used, and it might be wise to give uniions a separate classification. Meanwhile the Board's application of nonretail discretionary standards to this union is not unreasonable, and we perceive no considerations which compel this Court to resist it.
 
 
 20
 Local 11 makes the interesting point, that if the Board relies upon the fact of affiliation with an International to justify its assertion of jurisdiction over locals it will place a premium on non-affiliation. This question involving the wisdom of the Board's policy is more appropriately addressed to the Board than to a reviewing court. The issue before this Court is whether the Board has statutory jurisdiction in this particular case, and in the light of the Board's determination of this issue and the reasons assigned by it for its exercise of jurisdiction we cannot say that it violated any statutory mandate. Its assertion of jurisdiction in this instance resulted from its 'experience, appreciation of the complexities of the problem (and) realization of the statutory policy * * *' Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 209, 67 S.Ct. 1575, 1583, 1760, 91 L.Ed. 1995 (1947). We should not set ourselves against reasonable standards set up by the Board. See Friendly, the Federal Administrative Agencies; The Need for Better Definition of Standards, 75 H.L.Rev. 863, 891-903 (1962). In this instance we conclude that the Board correctly found that Local 11's affairs were subject to the active control of the International in several respects; and that he International's intervention in the Local 11-Local 153 dispute helped to provoke the unfair labor practices in issue. In these circumstances we have no difficulty in concluding that Local 11 was an integral part of a multistate enterprise which was within the Board's statutory jurisdiction.[7]
 
 
 21
 Since the Fund is not formally a part of the Local 11 organizational structure, the Board does not attempt to assert jurisdiction over it on the same principle applied to Local 11.[8] Instead, the Board refers to a stipulation entered into by the parties[9] which states that:
 
 
 22
 (a) during the calendar year 1958 the employers contributing to the Fund and 'serviced' by it included nine firms 'engaged in commerce' and clearly within the jurisdiction of the Board;
 
 
 23
 (b) during this period the Fund 'serviced' a total of 5,030 employees under the terms of its trust indenture, of which 2,708 were employed by the firms described in (a) above; and
 
 
 24
 (c) the nine employers engaged in commerce paid $165,547.37 to the Fund for its services.
 
 
 25
 On the basis of these facts the Board concluded that the Fund furnished services valued in excess of $50,000. to employers engaged in commerce and therefore it too was within the Board's jurisdiction under the indirect outflow standards set forth in Siemons Mailing Service, supra.
 
 
 26
 The Fund attempts to bring itself within a discretionary rule formulated by the Board whereby it declines to assert jurisdiction over certain non-profit organizations engaged in activities of a charitable nature.[10] We do not understand this respondent to argue that the the rule is based on a statutory prohibition, and that such organizations cannot fall within the miniumum jurisdictional standards; but even is inapplicable to is clear that the rule is inapplicable to the Fund. Union welfare trust funds are different from non-profit organizations such as hospitals and universities. The Fund may be 'non-profit' but it exists solely to service the employees of a particular industry as an integral part of the industry's system of labor relations. It is a mechanism whereby certain ends of a thoroughly commercial activity are achieved. It is, as the Board effectively points out, 'the means through which the employers provide the health and accident insurance and medical care for their employees for which the union has bargained and which constitute benefits for the employees flowing from the employment relationship.'[11] We agree with the Board that there is nothing in the inherent nature of a wflfare fund that places it behond the jurisdiction afforded by the Act.
 
 
 27
 Nor do the principles stated in N.L.R.B. v. Reliance Fuel Oil Corp., 297 F.2d 94 (2nd Cir. 1962) preclude the exercise of jurisdiction over the Fund in this case. In Reliance the Board was instructed to make further findings on the manner in which a labor dispute would tend to affect commerce.[12] In the present case the operation of the Fund has a direct impact on the employment benefits received by more than 2,700 employees of interstate employers in a single industry operating in a limited geographic area. In addition, disruption of its operations would have a direct impact on several thousand other employees in the same industry and location.
 
 
 28
 Although it would appear that the individual trustees of the Fund were named as respondents solely in their official capacity, we believe that in the absence of any evidence indicating that they were actually involved in the commission of unfair labor practices, the order should be phrased in a manner which does not suggest personal responsibility for the violations of Section 8(a)(1) and (5) of the Act.
 
 
 29
 The orders will be enforced as modified in accordance with this opinion.
 
 
 
 [1]
 Section 10(e), National Labor Relations Act, as amended, 29 U.S.C.A. 160(e)
 
 
 [2]
 Local 153 represented the Local 11 employees since 1945, and the Fund employees since 1957
 
 
 [3]
 29 U.S.C.A. 158(a)(1). This provision makes it an unfair labor practice for an employer 'to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title * * *.' Section 157 of Title 29 states:
 'Employees shall have the right to selforganization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *.'
 
 
 [4]
 Since there was substantial evidence of coercion, the employers are not protected by the 'free speech' provision of the Act, 29 U.S.C.A. 158(c)
 
 
 [5]
 Section 8(a)(5) of the Act, 29 U.S.C.A. 158(a)(5), makes it an unfair labor practice for an employer 'to refuse to bargain collectively with the representatives of his employees * * *.'
 
 
 [6]
 Respondents' Brief, p. 27
 
 
 [7]
 We express no opinion on the question whether affiliation alone, regardless of the extent of control permitted to an International, to Board jurisdiction as an integral part of a multi-state enterprise
 
 
 [8]
 The Board also declined to follow the recommendation of its trial examiner that recommendation of its trial examiner that jurisdiction be asserted on the basis of the Fund's 'purchase' of insurance premiums from an insurance company engaged in commerce
 
 
 [9]
 Gen. Counsel Exh. 14
 
 
 [10]
 See e.g., Sheltered Workshiops of San Diego, Inc., 126 N.L.R.B. 961 (1960); Trustees of Columbia University, 97 N.L.R.B. 424 (1951)
 
 
 [11]
 Board's Brief, p. 18
 
 
 [12]
 Whether or not intra-state activity affects commerce and is therefore within the scope of the Act must be determined according to the facts of each particular case. Consolidated Edison Co. of New York v. N.L.R.B., supra, 305 U.S. at p. 222, 59 S.Ct. 206, 83 L.Ed. 126; N.L.R.B. v. Reliance Fuel Oil Corp., supra, 297 F.2d at p. 98