USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-1727 NATIONAL LABOR RELATIONS BOARD, Petitioner, v. HARDING GLASS COMPANY, INC., Respondent. ____________________ ON APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD ____________________ Before Selya, Circuit Judge, _____________ Aldrich and Coffin, Senior Circuit Judges. _____________________ ____________________ Charles Donnelly, Supervisory Attorney, Joseph J. Jablonski, ________________ ____________________ Jr., Attorney, Frederick L. Feinstein, General Counsel, Linda ___ _______________________ _____ Sher, Associate General Counsel, Aileen A. Armstrong, Deputy ____ _____________________ Associate General Counsel, for petitioner. Robert Weihrauch for respondent. ________________ ____________________ March 27, 1996 ____________________ COFFIN, Senior Circuit Judge. The National Labor Relations ____________________ Board seeks enforcement of its order finding that Harding Glass Company committed a series of unfair labor practices and that an economic strike against the Company was converted to an unfair labor practice strike following Harding's unilateral implementation of its final offer. We affirm most of the Board's order but conclude that the record lacks substantial evidence to support its finding that the strike was converted. We therefore grant in part, and deny in part, the Board's application for enforcement.1 I. Background __________ Harding Glass ("the Company") is a small business in Worcester, Massachusetts that specializes in auto glass replacement, small construction and other similar glass-related projects. In mid-1993, when the events relevant to this case began, the Company employed three glassworkers and two glaziers. The glaziers were more highly paid and performed more skilled work. The Company and the Union that represented these five workers, Glaziers Local 1044 of the International Brotherhood of Painters and Allied Trades, AFL-CIO ("the Union"), had a  ____________________ 1 The Company does not challenge several of the Board's findings of violation of 8(a)(1) of the National Labor Relations Act, 29 U.S.C. 158(a)(1), including that (1) it interfered in the Board's investigation of unfair labor practice charges; (2) that it threatened employees with discharge and promised them higher wages in order to discourage them from supporting or remaining members of the Union; (3) and that it encouraged and assisted employees in the filing of a decertification petition. -2- longstanding collective bargaining arrangement through a multi- employer association, the GlassEmployers Group of Greater Boston. The most recent agreement signed by the Company and the Union had an expiration date of October 16, 1993. On June 30, the Company's president, Mark Goldstein, notified the Union that he wished to negotiate a separate agreement to replace the group contract that was expiring. Goldstein was concerned that his company was not competitive in the Worcester area because other glass shops there were not paying the much higher Union wage and benefits. The Union agreed to negotiate separately, and three meetings, each lasting about one hour, eventually were held. The Company proposed a one-year agreement that included substantial reductions in wages and benefits for the glaziers and an increase in the top rate for glassworkers, but with cuts in their benefits as well. During the discussions, the Union's business manager suggested techniques for cutting the Company's costs, the most significant of which involved using the lower-paid glassworkers to do much of the work that the Company currently was paying glaziers to do. Goldstein maintained that he could not rely on glassworkers to do the skilled work normally done by glaziers. On October 17, the glaziers rejected the Company's offer and voted to strike and establish a picket line, which they did the next day. The three glassworkers did not attend the meeting scheduled to discuss the Company's proposal to them, but they agreed not to cross the glaziers' picket line. The message sent -3- to the Company rejecting its offer stated that the Union was "ready and willing to continue negotiations." On October 22, Goldstein met with the three glassworkers and offered them the terms that had been contained in his proposal to the Union. The same day, the third negotiating session took place. No new proposals were made, but the parties again discussed the Union's suggestion that the Company use glassworkers for most of its business and rely on the Union hiring hall to provide glaziers when necessary. The business agent testified that the meeting ended with Goldstein saying that he would think about the Union's proposal and get back to him about it. The next day, however, Goldstein rejected the Union's approach as "unacceptable," and announced that the Company was implementing its final offer -- i.e., its original offer. The three glassworkers resigned from the Union and returned to work under the terms the Company had offered the Union: a small hourly wage increase, no pension and annuity benefits, modified health benefits, and fewer holidays.  No further negotiating sessions were held. The picket line remained in effect through December and, so far as the record indicates, the strike has to this date not been settled. The Union filed unfair labor practice charges against the Company, and, following a two-day hearing, an ALJ found multiple violations of the National Labor Relations Act and also determined that the strike was converted from an economic strike -4- to an unfair labor practice strike. The Board, with minor modifications, affirmed. On appeal, Harding challenges only two of the unfair labor practice findings: that Goldstein threatened employees with a shutdown of the business if they did not get rid of the Union and that the Company unilaterally implemented changes in employment conditions in the absence of a valid impasse in bargaining. The Company also contends that the record fails to demonstrate that the strike was prolonged by any of its conduct, and it therefore urges us to reject the finding of an unfair labor practice strike. We find no basis for disturbing the Board's determination with respect to either of the unfair labor practice charges, and believe that the ALJ's discussion, as modified by the Board's decision and Order, adequately addresses these issues.2 Our review of the record, however, persuades us that the finding of a  ____________________ 2 We note that, with respect to the alleged threats to close down the business, Dana Whitney, Charles Jones and James Tritone testified that such statements were made to them. See Tr. at ___ 127, 205, 220. The ALJ evidently did not credit Goldstein's assertion that he made only lawful complaints about how the high union wages made him non-competitive. "Such credibility determinations, of course, are for the Board rather than for us to make, and they stand unless beyond the `bounds of reason.'" NLRB v. Magnesium Casting Co., 668 F.2d 13, 21 (1st Cir. 1981) ____ ______________________ (citation omitted). See also The 3-E Company v. NLRB, 26 F.3d 1, ___ ____ _______________ ____ 3 (1st Cir. 1994). -5- strike conversion cannot be sustained.3 We discuss this issue in the following section. II. Discussion: Conversion of the Strike ____________________________________ It is well-established that "[a] strike begun in support of economic objectives becomes an unfair labor practice strike when the employer commits an intervening unfair labor practice which is found to make the strike last longer than it otherwise would have," Soule Glass and Glazing Co. v. NLRB, 652 F.2d 1055, 1079 ___________________________ ____ (1st Cir. 1981). Causation is crucial: "It must be found not only that the employer committed an unfair labor practice after the commencement of the strike, but that as a result the strike was `expanded to include a protest over [the] unfair labor practice[],' and that settlement of the strike was thereby delayed and the strike prolonged." Id. at 1079-80 (citations ___ omitted). The General Counsel bears the burden of proving causation, and the Board's finding of conversion must be supported by substantial evidence. Id. at 1080. Mere conjecture will not ___  ____________________ 3 The nature of the strike determines the reinstatement rights of striking employees once the work stoppage ends. An employer may refuse to reinstate economic strikers who have been permanently replaced during the strike. Unfair labor practice strikers are entitled to unconditional reinstatement, absent a contractual or statutory provision to the contrary, and are entitled to back pay even if they have been replaced during the strike. See General Indus. Employees Union Local 42 v. NLRB, 951 ___ _______________________________________ ____ F.2d 1308, 1311 (D.C. Cir. 1991); Soule Glass and Glazing Co. v. ___________________________ NLRB, 652 F.2d 1055, 1105 (1st Cir. 1981).  ____ -6- suffice. Facet Enterprises, Inc. v. NLRB, 907 F.2d 963, 977 ________________________ ____ (10th Cir. 1990). "[T]o sustain a finding of conversion, there must be some evidence in the record that the . . . employees reacted to information of [the unfair labor practice] substantively in a fashion which aggravated or prolonged the strike." Id. It need not be shown, however, that the employer's ___ unfair labor practice was the sole or even the primary factor in aggravating the strike, but only that it was "a contributing factor," NLRB v. Moore Business Forms, Inc., 574 F.2d 835, 840 ____ ___________________________ (5th Cir. 1978). Both objective and subjective factors may be probative of conversion. Applying objective criteria, the Board and reviewing court may properly consider the probable impact of the type of unfair labor practice in question on reasonable strikers in the relevant context. Applying subjective criteria, the Board and court may give substantial weight to the strikers' own characterization of their motive for continuing to strike after the unfair labor practice. Did they continue to view the strike as economic or did their focus shift to protesting the employer's unlawful conduct? Soule Glass, 652 F.2d at 1080. ___________ Applying these principles to the present case renders us unable to sustain the finding of conversion. The ALJ's discussion of this issue comprised a single brief paragraph within a three-page analysis of the Company's conduct. The decision stated in conclusory language that the Company's unilateral implementation of its final offer, together with its unlawful threats, promises and support of a decertification petition, "must" be found to have prolonged the strike, and -7- converted it "to one which must be deemed an unfair labor practice strike." ALJ Op. at 9.4 The Board affirmed the finding of conversion, but limited the basis for that determination to the Company's unlawful implementation of its last offer: Because the Respondent's initial bargaining proposal contained significant reductions in the compensation paid glaziers and caused them to strike on October 18, we conclude that the unlawful implementation of these very changes had a reasonable tendency to prolong the strike. Accordingly, we find that the strike converted to an unfair labor practice strike on October 25 when the striking glaziers became aware of the Respondent's unlawful implementation of its offer. As their language reveals, both the ALJ and the Board presumed that the Company's implementation of the wage package ________ that had triggered the strike aggravated and prolonged the work stoppage. Neither cites to testimony from the striking employees or any other evidence indicating that effectuation of the terms the employees had rejected strengthened their resolve to remain on strike or changed their attitude about the importance of a work stoppage in settling their differences with the Company.  ____________________ 4 We reproduce the ALJ's full discussion of the issue: Respondent's employees commenced an economic strike on October 18. On that same date, Respondent commenced upon a course of unilateral changes, changes which I have found occurred before any impasse in bargaining. Within two to three weeks, Respondent also began to undermine the Union's status among its employees, with threats, promises and unlawful support and encouragement of a decertification petition. Such conduct, I must find, prolonged the strike, which continues to this date, and converted that strike to one which must be deemed an unfair labor practice strike. -8- Our own reading of the hearing transcript also reveals nothing of that nature. We recognize that there are cases holding that some types of unfair labor practices inevitably impact the length of a strike. In SKS Die Casting & Machining, Inc. v. NLRB, 941 F.2d 984, 991 __________________________________ ____ (9th Cir. 1991), the court adopted the Board's conclusion that a refusal to reinstate strikers "by its nature" prolonged the strike because it blocked the termination of the strike at a time when the Union and striking employees had offered unconditionally to end it. The panel observed that "[t]o find conversion on this ground, it is not necessary to examine whether the Union was protesting the unfair labor practice at issue," and noted that the Board repeatedly had found that the refusal to reinstate strikers converts an economic strike into an unfair labor practices strike. Id. at 991-92. ___ The Eighth Circuit has made the same assumption of causation with respect to a withdrawal of recognition. See Vulcan Hart ___ ____________ Corp. (St. Louis Div.) v. NLRB, 718 F.2d 269, 276 (8th Cir. 1983) ______________________ ____ ("Whatever goals the strikers hoped to accomplish by striking, V- H's withdrawal of recognition clearly prolonged the strike, because it put an end to contract negotiations."). Accord C-Line ______ ______ Express, 292 N.L.R.B. 638 (1989). Indeed, as noted above, we, _______ too, have stated that the Board and reviewing court properly may consider objective criteria and evaluate "the probable impact of the type of unfair labor practice in question on reasonable -9- strikers in the relevant context." Soule Glass, 652 F.2d at ____________ 1080. Always, however, the principal focus must remain on the element of causation, and specific, subjective evidence of changed motivation may be foregone only in those instances in which the objective factors by themselves establish unequivocally that a conversion occurred. We do not believe that this is such a case. The glaziers went on strike to protest the substantially reduced wage offer made to them. The Company's decision to implement that offer did not directly impact the strikers; they already were out of work and therefore were not being paid. Thus, although we think it possible that the glaziers took a harder line once the Company gave force to its offer by adopting it, and perhaps increased their resolve not to end the strike until they received a satisfactory offer, such an effect of the Company's action is not inevitable. It is just as likely that the Company's continuing adherence to the unacceptable proposal - - the economic issue that triggered the strike -- was what continued to fuel their protest. Indeed, this case poses a somewhat unusual conversion question because the unfair labor practice is simply a reinforcement of the very conduct that caused the strike in the first place, rather than a collateral matter that may have added to the employees' dissatisfaction. The Board's obligation is to provide some basis for an inference that, in the aftermath of the -10- implementation, the employees were separately motivated by that act. Were we to accept as adequate the Board's assertion that "[t]he probable impact" of learning that the proposal had been implemented was "a reasonable tendency to prolong the strike," we would seriously diminish the causation requirement.5 The cases noted above that have presumed causation are easily distinguishable. See supra at 8-9. When a company ___ _____ refuses to reinstate employees who have offered to end a strike, the cause and effect are obvious. Had the company not unlawfully refused to take back those workers, the employees presumably would have followed through on their intention to end the work stoppage. Similarly, a withdrawal of recognition by definition means the end of negotiations, which inevitably causes more than just "a reasonable tendency to prolong the strike" but an actual delay in its resolution. By contrast, when a company unilaterally implements its final offer prematurely, we think it less than apparent that the already ongoing strike has been prolonged by the company's implementation of the offer rather ______________  ____________________ 5 The record here is notably different from that in NLRB v. ____ Powell Elec. Mfg. Co., 906 F.2d 1007, 1010 (5th Cir. 1990), which _____________________ also involved the unilateral implementation of a final offer. There, the company began to implement its proposal after its attorney declared at the end of a negotiating meeting that in his opinion the parties had reached an impasse. The next day, union members met with their attorney, who told them that he believed impasse had not been reached and that the strike consequently had been converted to an unfair labor practice strike. He then asked the members if they wanted to continue the strike as an unfair labor practice strike, and the members present voted unanimously to do so. The strikers also modified their picket signs to reflect that the strike was directed against company unfair practices. -11- than by its persistence in offering such poor terms.6 In short, we are reluctant to extend the principle of conversion-by- imputing-impact beyond those situations in which the link is unmistakable.  It would not have been difficult for the General Counsel to produce evidence, if it existed, that the employees were animated at least in part by the Company's unfair labor practice. Two of the striking glaziers testified at the hearing, as did the Union's business manager and business representative. Although counsel elicited testimony that the strikers were told of the Company's action, no questions were asked concerning the impact of that information on them. This gap is particularly significant in the absence of any manifestation of a change in outlook; the picket signs carried by the strikers, for example, simply announced the strike and did not explain its basis. Cf. ___ SKS Die Casting, 941 F.2d at 992 (union changed picket signs to _______________ reflect reaction to unfair labor practices and distributed handbills to that effect); NLRB v. Burkart Foam, Inc., 848 F.2d ____ __________________ 825, 832 n.6 (7th Cir. 1988) (same). See also NLRB v. Champ ___ ____ ____ _____ Corp., 933 F.2d 688, 694-95 (9th Cir. 1990).7 _____  ____________________ 6 If the Board had made a finding of bad faith bargaining, which it did not, this would be a different case. See C-Line ___ ______ Express, 292 N.L.R.B. 638 (1989). _______ 7 In Champ, the unfair labor practice at issue was the _____ discharge of certain striking employees, which prompted a unanimous vote of the union membership to remain on strike until all strikers were reinstated. 933 F.2d at 688. In addition, the union's negotiator informed the company's representative that the union could not agree to deny reinstatement to any person. The company's unlawful practice thus explicitly was identified as a -12- Because the record lacks evidence of "any concrete acts or affirmations" by the employees in response to the Company's unfair labor practice, see Facet, 907 F.2d at 977, and because we ___ _____ see no basis for presuming that the unilateral implementation of the terms that triggered the strike necessarily prolonged or intensified the work stoppage, we must reject the Board's finding of conversion.8 Accordingly, the Board's application for enforcement of its order is granted in part and denied in part.  ____________________ barrier to settlement of the strike.  8 The record is equally barren of evidence that other of the Company's unfair labor practices impacted the strike. -13-