NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

COCA–COLA BOTTLING COMPANY OF BUFFALO, INC., Respondent.

Docket No. 98–4152.

United States Court of Appeals, Second Circuit.

Argued March 5, 1999.

Decided Sept. 3, 1999.

James A. Prozzi, Pittsburgh, Pennsylvania (Jackson, Lewis, Schnitzler & Krupman, Pittsburgh, Pennsylvania, of counsel), for Respondent.

Fred B. Jacob, Washington, D.C., (John D. Burgoyne, Fred L. Cornnell, Frederick L. Feinstein, Linda Sher, National Labor Relations Board, of counsel), for Petitioner.

Before: CARDAMONE, JACOBS, and SOTOMAYOR, Circuit Judges.

CARDAMONE, Circuit Judge:

On this appeal the Coca–Cola Bottling Company of Buffalo, Inc. (Coca–Cola) challenges an order by the National Labor Relations Board finding two geographically separate facilities of the company to be one appropriate bargaining unit subject to the same collective bargaining agreement. Coca–Cola believes the presumption that they are separate for labor purposes has not been overcome, and thus the facilities should be deemed two entities for these purposes. Coca–Cola's proposition that the workplaces be deemed two is no more convincing than the famous Hollywood mogul Samuel Goldwyn's comment that he could answer a proposal in *two* words: "im-possible." The two facilities therefore which are one labor unit are both governed by the same collective bargaining agreement. Hence, this aspect of the appeal must be affirmed. Coca–Cola fares a bit

better in contesting the contributions it was ordered to pay to the union pension fund on behalf of three employees, as the Board wrongly granted that remedy with respect to one.

Coca–Cola has its principal office and place of business in Tonawanda, New York. This bottling company is engaged in the production and wholesale distribution of soft drink products. In 1988 it opened a new facility in Orchard Park, New York. The instant litigation stems from charges brought against Coca–Cola by employees working at the Tonawanda facility, who are represented by the Market Produce, Warehouse, Frozen Food, Cannery Workers, Drivers & Helpers, Local Union 588, of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO (union). The charges asserted that Coca–Cola violated the National Labor Relations Act by refusing to extend the collective bargaining agreement governing the Tonawanda facility to the employees at the newly-opened Orchard Park facility.

The National Labor Relations Board (NLRB or Board) seeks enforcement of its supplemental decision and order entered January 23, 1998, which adopted the June 26, 1996 decision of an administrative law judge. *See Coca–Cola Bottling Co.,* 325 N.L.R.B. No. 40, 1998 WL 30263 (Jan. 23, 1998). The decision held that Orchard Park was not a separate appropriate bargaining unit, and that by refusing to extend the existing agreement to Orchard Park employees, Coca–Cola had violated § 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) & (5) (1994) (prohibiting, respectively, interference with employees' exercise of their rights to choose their bargaining representatives and refusal to bargain with the union chosen by employees as their collective bargaining agent). To make the Orchard Park employees whole, the Board ordered Coca–Cola to pay backpay to three employees and to contribute to the union pension fund as required under the collective bargaining agreement.

## BACKGROUND

### A. *Tonawanda and Orchard Park Facilities*

The following facts, which the parties agreed were to be applied to the instant phase of this case, are taken from *Coca–Cola Bottling Co.,* 299 N.L.R.B. 989, 1990 WL 155358 (1990) (*Coca–Cola I*). Orchard Park was opened in 1988 to service the southern area of the Coca–Cola franchise territory that had previously been serviced by Tonawanda. The employees at Tonawanda were members of the union, a labor organization within the meaning of the Act. Orchard Park, located 21 miles from Tonawanda, was used exclusively as a warehouse facility, and being much smaller than Tonawanda, was originally staffed by only four employees, including all three involved in this case: Melvin Mingoia, a bargaining unit employee and transferee from Tonawanda; Michael Haug, a non-bargaining unit employee and transferee from Tonawanda; and John McKissock, a new hire. The last original employee was a transferee from Tonawanda.

The job functions and skills of the employees at both of the employer's units were virtually identical. They spent most of their time loading trucks for delivery and distribution, and "stripping" or unloading trucks with products that were then placed in the warehouse for later distribution. Each truck at Orchard Park was loaded pursuant to a "load map" faxed daily from Tonawanda, which also exercised control over various other aspects of Orchard Park's daily operations. Each facility had a warehouse supervisor who handled the day-to-day relations of the employees under him, but the supervisor at Orchard Park also acted much of the time as an ordinary employee. Both supervisors reported to an operations manager at Tonawanda. Hiring, scheduling, merit pay raises, and authorizations of vacation re-

quests for employees of both facilities were also centralized at Tonawanda.

In July 1988 the union asked Coca–Cola to recognize it as the collective bargaining representative for the employees at Orchard Park and to apply to them the parties' collective bargaining agreement. When Coca–Cola refused, the union filed a grievance. Coca–Cola responded that under its reading of current law, Orchard Park was not subject to Tonawanda's collective bargaining agreement because the Orchard Park facility was not an accretion to the Tonawanda facility. The union then filed the instant charge of an unfair labor practice.

The collective bargaining agreement required Coca–Cola to contribute to the union's pension fund on behalf of each employee covered by the agreement. The pension plan contained a ten-year vesting requirement, meaning a covered employee gained the right to a pension at age 65 upon ten years of credited service for which contributions had been made to the pension fund by one or more contributing employers. An individual not vested in the plan would lose all credits on a three-year break in service. Although Coca–Cola did not make contributions to the union's pension fund for Orchard Park employees, it did make payments to a private pension fund it had established for them, with terms and benefits allegedly superior to the union's pension fund.

### B. *Prior Proceedings*

In *NLRB v. Coca–Cola Bottling Co.*, 936 F.2d 122, 127 (2d Cir.1991) (*Coca–Cola II* ), we ruled, enforcing *Coca–Cola I*, 299 N.L.R.B. at 989, that Orchard Park was a "spinoff" of Tonawanda, with the result that the Orchard Park employees were subject to the terms of the existing Tonawanda collective bargaining agreement. Thus, its provisions as to compensation, seniority rights, and pension fund contributions were deemed applicable to employees at Orchard Park.

After we enforced the Board's order, the NLRB issued a compliance specification on October 31, 1991, setting forth the net backpay due to each discriminatee and the amount of contributions due to the union's pension fund. In February 1992 an administrative law judge (ALJ) held a hearing to resolve Coca–Cola's objections to the compliance specification. On September 30, 1992 after the hearing concluded, but before the ALJ had issued his decision, the NLRB decided *Gitano Group, Inc.*, 308 N.L.R.B. 1172, 1992 WL 281657 (1992), expressly overruling the "spinoff" theory underlying *Coca–Cola I* and replacing it with the following rule

[W]e announce today that when an employer transfers a portion of its employees at one location to a new location, we will no longer define the nature of the transfer in terms of the relationship between the "new" unit and the "old" unit (i.e., whether one is a "spinoff" or "partial relocation" from the other). Rather, we will begin with the Board's long-held rebuttable presumption that the unit at the new facility is a separate appropriate unit. Assuming that that presumption is not rebutted, we will then apply a simple fact-based majority test to determine whether the [employer] is obligated to recognize and bargain with the union as the representative of the unit at the new facility. If a majority of the employees in the unit at the new facility are transferees from the original bargaining unit, we will presume that those employees continue to support the union and find that the employer is obligated to recognize and bargain with the union as the exclusive collective bargaining representative of the employees in the new unit.

*Id.* at 1175. The Board specifically overruled its decision in *Coca–Cola I* to the extent that it was inconsistent with *Gitano.* See *id.* at 1175 n. 22.

Coca–Cola promptly filed a motion with the NLRB to dismiss the pending compliance specification in light of *Gitano.* The

Board denied the motion, concluding that under § 10(e) of the Act, 29 U.S.C. § 160(e), it lacked jurisdiction to modify an order after that order had been enforced by a reviewing court. On March 31, 1993 the ALJ issued a supplemental decision rejecting Coca–Cola's objections to the compliance specification and ordering specific amounts of backpay and contributions to the pension fund. A year later, on April 13, 1994, the NLRB issued a supplemental decision and order, affirming the rulings, findings, and conclusions of the ALJ and adopting his recommended order. *See Coca–Cola Bottling Co.,* 313 N.L.R.B. 1061, 1061, 1994 WL 135228 (1994) (*Coca–Cola III* ).

On the Board's application for enforcement of its supplemental decision and order, we agreed that the Board had no jurisdiction to modify *Coca–Cola I* in light of our earlier enforcement of it in *Coca–Cola II. See NLRB v. Coca–Cola Bottling Co.,* 55 F.3d 74, 77 (2d Cir.1995) (*Coca–Cola IV* ). We stated that we had the authority to revise our own prior rulings, but rather than enforcing the NLRB's order, we remanded to the Board for it to decide in the first instance—free of our ruling in *Coca–Cola II*—whether to apply *Gitano* to this proceeding. *Id.* at 78. On remand, the Board returned the case to an ALJ to consider whether Coca–Cola should be held liable for an unfair labor practice under the principles set out in *Gitano.*

The ALJ ruled on June 26, 1996 that even under *Gitano,* Coca–Cola was still required to apply the terms of the Tonawanda collective bargaining agreement to the employees at Orchard Park. The ALJ was of the opinion that the high degree of functional integration between the two facilities, the centralized control of the daily operations and all aspects of labor relations at Tonawanda, Orchard Park's lack of an independent supervisor, and the similarity of employment conditions created a community of interest between the two

facilities that rebutted any presumption that Orchard Park was a separate unit.

On January 23, 1998 the Board issued its third supplemental decision and order, adopting the ALJ's conclusions and requiring Coca–Cola to make whole its employees, as provided earlier in *Coca–Cola III,* 313 N.L.R.B. at 1068. The petition before us today is for enforcement of this third supplemental order.

## DISCUSSION

### I  Appropriate Unit

#### A.  *Standard of Review*

▇▇▇▇  Because the NLRB's determination of an appropriate bargaining unit "involves of necessity a large measure of informed discretion," the Board's decision, "if not final, is rarely to be disturbed." *South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Engineers, AFL–CIO,* 425 U.S. 800, 805, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (quoting *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947)). Our review is accordingly limited. We must affirm an order if the Board's factual findings are supported by substantial evidence, viewing the record as a whole, and its legal conclusions are reasonably based. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Katz's Deli of Houston Street, Inc.,* 80 F.3d 755, 763 (2d Cir.1996). The NLRB's selection of an appropriate bargaining unit will stand unless found to be unreasonable and arbitrary. *See NLRB v. Heartshare Human Servs., Inc.,* 108 F.3d 467, 471 (2d Cir.1997).

#### B.  *Legal Principles*

▇▇▇▇  An employer violates § 8(a)(1) of the Act when it acts "to interfere with, restrain, or coerce employees in the exercise of [their] rights [under the Act]" to choose their bargaining representatives. *See* 29 U.S.C. § 158(a)(1). Under § 8(a)(5), an employer's "refus[al] to bargain collectively with the representatives

of [its] employees" constitutes an unfair labor practice. *See id.* § 158(a)(5). Accordingly, an employer violates both § 8(a)(1) and (5) by refusing to recognize and bargain with the union chosen as the representative of all bargaining-unit employees and by failing to apply a collective bargaining agreement to every employee in a unit. *See Heartshare,* 108 F.3d at 470.

When an employer transfers employees from a unionized facility to a new facility, the question arises whether the pre-existing collective bargaining agreement extends to the employees at the new locale. In *Gitano,* 308 N.L.R.B. at 1172, the Board articulated a new standard for resolving that question. Under the new rule, the NLRB presumes that the new facility is "a separate appropriate unit"— that is, it is separate from the original unit, and no bargaining obligation automatically attaches to the new unit. *Id.* at 1175. But that presumption may be rebutted by a showing that the new facility "has been so effectively merged into a more comprehensive unit, or is so functionally integrated that it has lost its separate identity." *J&L Plate, Inc.,* 310 N.L.R.B. 429, 429, 1993 WL 37605 (1993). The burden of showing such integration is on the party seeking to rebut the presumption, here the union, which must present evidence affirmatively establishing a lack of autonomy at the individual plant level. *Id.*

In determining if the presumption has been rebutted, the Board examines whether a group of employees has a "sufficient community of interests to justify defining it as a bargaining unit." *Heartshare,* 108 F.3d at 471. The degree of shared interest is analyzed by such factors as

> central control over daily operations and labor relations, including the extent of local autonomy; similarity of employee skills, functions, and working conditions; degree of employee interchange; distance between locations; and bargaining history, if any.

*Mercy Health Servs. North,* 311 N.L.R.B. 367, 367, 1993 WL 186156 (1993); *accord*

*Heartshare,* 108 F.3d at 471; *J & L Plate,* 310 N.L.R.B. at 429. Nonetheless, not all of these factors need be explicitly assessed. A strong showing on just a few of them can suffice for us to affirm the Board's order. *See Heartshare,* 108 F.3d at 472.

If the presumption is rebutted, the Board will accrete the employees at the new facility to the existing bargaining unit. *See Mercy Health Servs.,* 311 N.L.R.B. at 368. In such event, the employer will be obligated to apply the terms of the pre-existing collective bargaining agreement to the new facility.

### C. *Analysis*

■ Coca–Cola argues that the Board erred in concluding that the presumption that Tonawanda was a separate appropriate unit had been rebutted. Specifically, it asserts there was not a high degree of employee interchange and common day-to-day supervision between the Orchard Park and Tonawanda facilities, and thus the union's burden to demonstrate a lack of autonomy at Orchard Park was not met. To the contrary, the Board's findings, especially in light of our deferential standard of review, appear reasonably based.

Many relevant factors militate in favor of finding a multi-site unit. Control over Orchard Park's daily operations was centralized at Tonawanda. Management at Tonawanda prepared for Orchard Park each day's schedules, work assignments, and "load maps" directing the manner in which the Orchard Park employees should load the trucks. Further, Tonawanda controlled the hiring of Orchard Park employees and their pay, pay raises, benefits, and vacation requests; hence, it may accurately be said that the management of Orchard Park employees is based at Tonawanda. Such control by Tonawanda over Orchard Park's daily operations and labor conditions amply supports the Board's finding that Orchard Park is not a separate unit. *See NLRB v. Solis Theatre Corp.,* 403 F.2d

381, 383 (2d Cir.1968) (centralized control of labor conditions such as hiring, wages, and vacation scheduling supports finding of multi-site unit); *Neodata Prod./Distribution, Inc.,* 312 N.L.R.B. 987, 988–89, 1993 WL 402927 (1993) (finding multi-site unit where original headquarters controlled daily operations and labor conditions of new facility).

The Board additionally found that the functional integration between the two facilities was "almost total." Every account serviced by Orchard Park originated at Tonawanda, and every product distributed to customers through Orchard Park was first delivered there from Tonawanda. An Orchard Park employee picked up products from Tonawanda at least twice daily. Tonawanda mechanics serviced and repaired Orchard Park trucks and other equipment, such as forklifts. Such operational integration also favors treating the two facilities as one unit. *See Neodata,* 312 N.L.R.B. at 988.

Contrary to Coca–Cola's assertions, the Board found some employee interchange between the two facilities, as the employee who delivered goods from Tonawanda to Orchard Park was required to punch in and out of work at Tonawanda even though his primary duty station was Orchard Park. Because Orchard Park, the smaller unit, had only three or four employees at this time, even a low level of interchange may have significance. *See NLRB v. Carson Cable TV,* 795 F.2d 879, 885 (9th Cir.1986).

The Board also found that employees at both locations had "identical" job functions, working conditions, and skills. Finally, the Board held that although the 21 mile distance between the two facilities could be viewed as a factor in support of finding that Orchard Park was a separate unit, in the circumstances of this case distance was outweighed by the other factors discussed above.

■ Coca–Cola appears to urge that the NLRB's decision was arbitrary when viewed in light of other cases decided by the Board, where separate bargaining units were found on allegedly similar facts. But, the cases cited by Coca–Cola to support this assertion can be distinguished on the grounds that the local supervisor in those cases had greater authority than the supervisor at Orchard Park, who was found to be at best a "working supervisor" performing mainly ordinary employee duties. *See D&L Transp., Inc.,* 324 N.L.R.B. 160, 162, 1997 WL 453115 (1997) (describing supervisor of new facility as full terminal manager); *Overnite Transp. Co.,* 311 N.L.R.B. 1242, 1993 WL 291412 (1993) (finding separate unit when two terminals had almost identical supervisory structures); *J & L Plate,* 310 N.L.R.B. at 429, 429 (describing completely separate managements at two facilities); *Red Lobster,* 300 N.L.R.B. 908, 908–09, 1990 WL 250744 (1990) (describing separate general managers with substantial authority over working conditions and daily operations). Moreover, since the Board has wide discretion in designating bargaining units, minor factual differences between cases may justify contrary results. *See Carson Cable,* 795 F.2d at 886; *Atlas Hotels, Inc. v. NLRB,* 519 F.2d 1330, 1335 (9th Cir.1975) (per curiam).

In sum, the Board's conclusion that the presumption in favor of a separate appropriate unit was rebutted, was neither unreasonable nor arbitrary. Consequently, under the deferential standard of review we employ, this aspect of the Board's decision must be affirmed.

## II  Remedies

### A.  *Standard of Review on Remedies Imposed*

■ The Board's discretionary power to fashion remedies for violations of the National Labor Relations Act is broad. *See* 29 U.S.C. § 160(c) (1994) (authorizing the Board to issue orders requiring such action "as will effectuate the policies of this [Act]"). Because of the Board's unique expertise in labor disputes, we accord def-

erence to the remedy it imposes. *See Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Hence, the remedy selected is subject to limited judicial review, and "will not be overturned if it may fairly be said to have as its purpose ends that will effectuate the policies of the Act." *Manhattan Eye Ear & Throat Hosp. v. NLRB,* 942 F.2d 151, 156 (2d Cir.1991).

■ Because the policies of the Act are "essentially remedial," an award must compensate only for the injury actually suffered by the employees. *Manhattan Eye,* 942 F.2d at 156–57; *accord Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 900, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (per curiam) (only actual, rather than merely speculative, damages may be redressed); *Republic Steel Corp. v. NLRB,* 311 U.S. 7, 10, 61 S.Ct. 77, 85 L.Ed. 6 (1940) ("The Act does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees.").

### B. *Fund Contributions*

Under the collective bargaining agreement in effect during the backpay period, Coca–Cola was obligated to make set contributions to the union's pension fund. Instead, Coca–Cola made contributions to its private pension plan on behalf of the three employees involved. As part of the remedy, the Board ordered Coca–Cola to pay the amounts it should have contributed on their behalf to the union's pension fund.

■ Remedies designed to compensate for an employer's failure to make payments into a union fund must redress actual injury suffered by the employees. As such, "before the Board may award backpayments for failure to pay into [a union fund], it must have concrete evidence that the [employees] have an economic interest in the future of [that fund]." *Manhattan Eye,* 942 F.2d at 157–58. If such future interest exists, backpayments to the union

fund are remedial because they insure the fund's financial viability necessary to satisfy employees' future needs. *See id.* at 157–60. This remedial goal remains even where the employer has made additional payments to substitute funds. *See id.*

■ In the present case, we consider each Orchard Park employee separately. As a current Coca–Cola employee who participates in the pension fund, McKissock has a future interest in the financial strength of the fund. Similarly, Haug has a vested right to a pension from the pension fund and therefore also has a demonstrated future interest.

■ However, Melvin Mingoia is no longer employed by Coca–Cola, having been discharged in September 1991. Further, the NLRB-ordered backpayments would not retroactively vest his interest in the pension fund because he would still not have accumulated the ten years worth of service credits required to obtain the right to a pension. In light of the three year "break-in-service" condition of the pension fund, Mingoia would gain a future interest in the fund only if he was rehired before 1994 by an employer covered by the union pension fund and continued to work for such an employer for at least six years thereafter, giving him the ten years of service necessary for vesting purposes.

In its decision in *Coca–Cola III,* the ALJ found that Mingoia still had a future interest in the fund based on the possibility that Mingoia might be re-employed by 1994. But, as we noted in *Manhattan Eye,* a mere possibility is not sufficient to demonstrate a future interest. Instead, concrete evidence of each employee's economic interest in the future of the fund is required. *See id.* at 157 ("[T]he possibility that the [employee] might later seek coverage under the [union fund] is too speculative a basis on which to base a backpay award."). Mingoia's future interest in the pension fund was not sufficiently demonstrated to support an order of backpayments to it on his behalf. Accordingly,

any such payments to the pension fund on his behalf are not remedial, but rather constitute a windfall to the fund. We therefore may not grant enforcement of the Board's order with respect to backpayments to the pension fund on behalf of Mingoia.

### C. Calculation of Backpay for McKissock

■ The gross backpay due a discriminatee is the amount that will "restore the situation 'as nearly as possible, to that which would have obtained but for the illegal discrimination.'" *Sure–Tan,* 467 U.S. at 900, 104 S.Ct. 2803 (quoting *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 198, 61 S.Ct. 845, 85 L.Ed. 1271 (1941)). The backpay remedy "must be sufficiently tailored to expunge only the *actual,* and not merely *speculative,* consequences of the unfair labor practices." *Id.* But, at the same time, a backpay award is "only an approximation, necessitated by the employer's wrongful conduct." *Bagel Bakers Council v. NLRB,* 555 F.2d 304, 305 (2d Cir.1977).

■ Coca–Cola maintains that the Board miscalculated McKissock's backpay, contending it should have been based on the irregular schedule McKissock actually worked, rather than a 40–hour work week. The NLRB responds that Coca–Cola's unlawful failure to apply the Tonawanda collective bargaining agreement to Orchard Park prevented McKissock from using his seniority to bump into a full time position when Coca–Cola placed him on an irregular schedule. For that reason, the Board concluded that, but for Coca–Cola's unlawful acts, McKissock would have worked 40 hours per week during the backpay period.

The Tonawanda collective bargaining agreement provides that "[w]here the ability to perform the work is relatively equal, the employee with the greatest departmental seniority shall be the last to be laid off and the first to be rehired." Further, "[a] laid off employee with greater plant seniority shall have the right to 'bump' an employee with less plant seniority provided the senior employee has the ability to perform the job without a training or break-in period." The Board found that in practice, an employee laid off for more than one day had the right to "bump" into his own shift, unless he lacked seniority or qualifications, in which case he could attempt to "bump" into another shift, so long as he did not require a training or break-in period.

The Board noted that McKissock ranked 21st out of 35 employees on the bargaining unit's seniority list. Yet during McKissock's layoff, employees at Tonawanda with less seniority continued their full-time employment schedules. Specifically, the Board noted that Coca–Cola did not lay off employees Nicholas Tiberio and Donald Loops, who ranked 22nd and 24th, respectively, and performed work that McKissock could have undertaken without further training. In light of these findings, the Board reasonably concluded that McKissock's seniority would have enabled him to work a 40–hour work week if the collective bargaining agreement had been properly applied.

Coca–Cola declares that the seniority list which the Board examined was unreliable, since it was prepared as of October 23, 1991, four months after the backpay period ended. Nonetheless, because the seniority list was prepared from records kept by the employer, it bore the burden of proving any discrepancies. As the party that kept the records, Coca–Cola was in the best position to explain them and to interpret any inconsistencies they may have contained. *See NLRB v. Mastro Plastics Corp.,* 354 F.2d 170, 176 (2d Cir.1965); *see also Kawasaki Motors Mfg. Corp. v. NLRB,* 850 F.2d 524, 527 (9th Cir.1988) (doubts regarding factual issues affecting gross amount of backpay due are resolved against employer). Coca–Cola failed to present evidence disproving the reliability of the seniority list used by the Board, and thus use of the list was proper.

Finally, Coca–Cola points to the Board's decision in *Ford Bros., Inc. v. Local 159*, 284 N.L.R.B. 211, 1987 WL 89731 (1987), which it believes rejected the use of this type of "lost work" theory in calculating backpay awards. But in *Ford Bros.*, the Board only refused to apply the "lost work" theory as a measure of backpay liability because the theory relied upon an assumption that jobs were assigned by seniority, and the record did not support that assumption. *Id.* at 211–12, 217–18. Moreover, the Board found it impossible to reconstruct accurately the job assignments. In contrast, here, the Board found that Coca–Cola did in fact assign jobs by seniority. Consequently, the Board properly calculated McKissock's backpay award, and such award furthered the remedial purposes of the Act.

## CONCLUSION

Accordingly, we grant enforcement of the NLRB's order, except that portion ordering Coca–Cola to make backpayments to the union pension fund on behalf of Mingoia, which we deny.