# United States Court of Appeals
## For the First Circuit

No. 06-2540

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

HARDING GLASS COMPANY, INC.,

Respondent.

ON PETITION FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Lynch, <u>Circuit Judge</u>,
Selya, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

<u>Christopher W. Young</u>, Attorney, National Labor Relations Board, with whom <u>Fred B. Jacob</u>, Supervisory Attorney, <u>Ronald Meisburg</u>, General Counsel, <u>John E. Higgins, Jr.</u>, Deputy General Counsel, <u>John H. Ferguson</u>, Associate General Counsel, and <u>Aileen A. Armstrong</u>, Deputy Associate General Counsel, were on brief, for petitioner.
<u>Robert Weihrauch</u> for respondent.

August 17, 2007

**LYNCH**, <u>Circuit Judge</u>.  The slow grinding of the wheels of justice is a major theme in this National Labor Relations Board ("NLRB") compliance case.

In 2006, the NLRB awarded remedies for unfair labor practices committed by Harding Glass Company ("Harding") in 1993. <u>Harding Glass Co. (Harding III)</u>, 347 N.L.R.B. No. 102, at 2 (Aug. 29, 2006).  Those remedies awarded over $144,000 in back pay to nine employees and over $360,000 to four union funds, with accrued interest.  <u>Id.</u>  The Board seeks enforcement; the company says that enforcement should be denied, arguing that it would be driven out of business by enforcement of the order and that the sums owed should, at the least, be discounted for the delay in the resolution of this matter.

The case has cautionary lessons for counsel about the costs of minimalist responses to Board allegations.  Here, the company failed to comply with the Board's rules for answering compliance specifications.  Those rules require highly specific information, going well beyond the requirements for answers in civil actions in federal courts.  Additionally, although interesting legal issues may lurk as to the limits of the Board's ability to order payment to union funds, the company has failed to provide any facts, thus rendering the questions hypothetical.

We reject the company's arguments and enforce the Board's order. We note that the Board has offered to work with the company on a payment plan, should that be necessary.

I.

This saga, unfortunately, has taken fourteen years. Harding sells and installs glass for automobiles and commercial buildings in Worcester, Massachusetts. In October 1993, the company employed two glaziers and three glassworkers. The glaziers repaired and installed industrial and commercial glass, while the glassworkers repaired and replaced automobile glass. Glaziers Local 1044, International Brotherhood of Painters & Allied Trades, AFL-CIO ("the Union"), represented both sets of employees.

Several months before the expiration of the then-current collective bargaining agreement on October 16, 1993, the parties, at Harding's request, entered into negotiations for a successor agreement. The company proposed to reduce the glaziers' pay rate from $22.05 per hour to $13.73 per hour, while raising the glassworkers' pay rate from $13.23 per hour to $13.73 per hour. The company also proposed eliminating all contributions to the Union's health, welfare, pension, and annuity funds; it proposed replacing only the health fund with another insurance plan. The Union put forward a counterproposal, which Harding rejected. On October 17, the glaziers voted to reject Harding's offer and

-3-

strike. They established a picket line the next day. The glassworkers initially respected the glaziers' picket line.

The parties met again on October 22 but failed to reach an agreement. On October 23, Harding implemented its final offer. The company offered the glassworkers the wage and benefit package it had initially offered the Union, while at the same time threatening to replace them. The three glassworkers resigned from the Union and resumed working for Harding. The two glaziers maintained their picket line, and the company hired a new glazier under its new terms and conditions of employment. The Union filed unfair labor practice charges against Harding alleging that the company had, inter alia, unilaterally implemented its final offer in the absence of a bona fide impasse in collective bargaining.

The Board, on March 31, 1995, held that the company had, by its actions, violated section 8(a)(5) of the National Labor Relations Act ("NLRA") by implementing unilateral changes in employment conditions without a valid impasse in bargaining. Harding Glass Co. (Harding I), 316 N.L.R.B. 985, 985 (1995). This court, on March 27, 1996, enforced that portion of the Board's order.[1] NLRB v. Harding Glass Co., 80 F.3d 7, 10 (1st Cir. 1996).

_____

[1] The court denied enforcement of another portion of the order, disagreeing with the Board that the economic strike, begun on October 18, 1993, had been converted to an unfair labor practice strike on October 25, 1993, the date union representatives informed the striking glaziers of Harding's implementation of unilateral changes. NLRB v. Harding Glass Co., 80 F.3d 7, 11, 13 (1st Cir. 1996).

-4-

Under the relevant provisions of the Board's order, the company was directed to restore all terms and conditions of employment to the status quo as of October 23, 1993 and to make whole all employees and union funds for the losses they had suffered.  Harding I, 316 N.L.R.B. at 986.  It is this make-whole obligation for the 1993 events that is the subject matter of the proceedings before us.

Once it had the enforcement order, the agency did not act promptly.  The Regional Office did not issue a Compliance Specification until July 1, 1997.  Thereafter, it issued a First Amended Compliance Specification on January 20, 2000.  After various proceedings, the Board issued an order on August 1, 2002, granting in large part the General Counsel's motion to strike portions of Harding's answer for failure to comply with the Board's rules.  Those rules require respondents who dispute compliance allegations to provide supporting figures or information.  The Board, having struck most of Harding's answer, then granted, with one exception, summary judgment against the company on the pay rates and the method of back pay calculation alleged by the General Counsel to apply to the affected employees.  Harding Glass Co. (Harding II), 337 N.L.R.B. No. 175, at 2-4 (Aug. 1, 2002).  The Board denied the motion for summary judgment as to employee James Tritone and left open for litigation the issue of whether Tritone's back pay should be based on the full contract rate for a glazier, $22.05 per hour, at the time of Tritone's reinstatement after

-5-

recovering from a work-related injury. Id. at 2-3. For the period in question, from March 28 to April 15, 1994, Harding had paid Tritone at the rate of $13.73 per hour. The Board also left open for litigation the parties' dispute over the date on which the economic strike ended. Id. at 3-4.

In its 2002 order, the Board rejected the company's affirmative defense that the amended compliance specification should be dismissed in its entirety because of delay by the Regional Office. The Board was not moved by the two-and-a-half-year gap between the issuance of the initial Compliance Specification and the First Amended Compliance Specification. The Board similarly rejected Harding's defense that it was entitled to offset on the payments due to the union funds for the value of alternative benefit payments made by the company. The Board ordered that both affirmative defenses be stricken. Id. Thus, the 2002 Board order resolved most, but not all, of the remedial issues and remanded the remaining matters to an administrative law judge ("ALJ") for hearing. Id.

The company, instead of trying to expedite the remaining proceedings, took the opposite tack. It did not ask the Board to enter final judgment in 2002 on the matters then resolved. Rather, Harding chose to petition for review of the Board's interlocutory order. The predictable result was that this court granted, on

November 25, 2002, the Board's motion to dismiss on the ground that we lacked jurisdiction because there was no final order.

Again there was delay by the Regional Office as to the issues remanded to the ALJ. The Regional Office, over two years later, issued a Second Amended Compliance Specification on December 22, 2004. That was updated by a Third Amended Compliance Specification on January 19, 2005.

On April 12, 2005, the General Counsel filed a motion in limine to preclude Harding from rearguing issues that had already been resolved against the company in the underlying unfair labor practice proceedings. On April 27, 2005, the ALJ granted the motion, over the company's objection.

On June 29, 2005, the ALJ issued a supplemental decision agreeing with the Regional Director's back pay calculations for the individual employees as well as for monies due to the union funds. The ALJ agreed with the Regional Director that the economic strike ended on June 4, 1996, and that the back pay period for replacement workers began on the following day, June 5, 1996. As to the issue of back pay for Tritone, the ALJ found that he was entitled to the full contract rate for glaziers, and awarded back pay to Tritone in the amount of $975.89 plus interest. In total, the ALJ ordered Harding to pay lost wages of $144,074.95 plus interest to nine

employees[2] and $360,067.37 plus interest to four union funds.[3]  The company sought review by the Board.

On August 29, 2006, the Board rejected the company's exceptions, adopted the ALJ's rulings, and directed Harding to pay the specified amounts plus interest to the employees and the union funds.  Harding III, 347 N.L.R.B. No. 102, at 1-2.  With respect to the calculation of Tritone's back pay, the Board agreed with the ALJ that Tritone was entitled to the contractual glazier rate of $22.05 per hour for the period from March 28 to April 15, 1994. Id. at 2.

On October 25, 2006, the Board petitioned for enforcement of its order in full.  Harding did not cross-petition for review, but it did assert in its answer to the enforcement application that the Board's decision and order "are without foundation in law or fact and are erroneous as a matter of law" and "are not supported by substantial evidence on the record as a whole."

II.

A.      The Board's 1995 Order

On several occasions, Harding has attempted to relitigate issues already decided against it in the Board's March 31, 1995

---

[2]      The employees are Robert Mosely, James Tritone, Richard Poirer, James Gabrielle, Richard VonMerta, David Elworthy, Christopher Carle, Christopher Pelletier, and Kenneth Bullock.

[3]      The funds are the Health and Welfare Fund, the Pension Fund, the Annuity Fund, and the Apprenticeship Fund.

order.  The Board and the ALJ justifiably rejected these efforts. See Transport Serv. Co., 314 N.L.R.B. 458, 459 (1994) ("Issues litigated and decided in an unfair labor practice proceeding may not be relitigated in the ensuing backpay proceeding.").

To the extent Harding argues before this court that it did not unilaterally implement its last and final offer in the absence of a valid impasse in bargaining, that argument is foreclosed.  The Board's 1995 order concluded that Harding implemented unilateral changes without having reached a bona fide impasse.  Harding I, 316 N.L.R.B. at 985.  A different panel of this court affirmed that conclusion.  Harding Glass Co., 80 F.3d at 10, 13.  We will not reconsider the issue here.  The company is not free to relitigate in an enforcement proceeding the underlying finding of liability already decided by this court.

B.      The Board's 2002 Entry of Summary Judgment and Striking of Affirmative Defenses

Harding argues that the Board erred (1) in sua sponte granting summary judgment for the Regional Director on certain claims (e.g., dates pertaining to employees' back pay periods and the status of eight employees as strike replacement workers) which would otherwise have been litigated; (2) in allowing the Director's request for summary judgment that two employees, David Elworthy and Christopher Pelletier, were entitled to the glassworkers' pay rate;

and (3) in striking the company's affirmative defense of mitigation of liability to the union funds.[4]

What all three claims have in common is Harding's failure to understand or meet its responsibilities in answering compliance specifications issued by the Regional Director. The applicable rules, contained in the Code of Federal Regulations, provide:

> The answer shall specifically admit, deny, or explain each and every allegation of the specification, unless the respondent is without knowledge, in which case the respondent shall so state, such statement operating as a denial. Denials shall fairly meet the substance of the allegations of the specification at issue. . . . As to all matters within the knowledge of the respondent, including but not limited to the various factors entering into the computation of gross backpay, <u>a general denial shall not suffice</u>. As to such matters, if the respondent disputes either the accuracy of the figures in the specification or the premises on which they are based, the answer shall specifically state the basis for such disagreement, setting forth in detail the respondent's position as to the applicable premises and furnishing the appropriate supporting figures.

29 C.F.R. § 102.56(b) (emphasis added).

Harding responded to the Regional Director's compliance specification with general denials and inadequate explanations. It did not, for example, in its answers and amended answers dispute

---

[4] Harding also argues that it should have been permitted to introduce evidence regarding its affirmative defense that the delay in initiating the compliance proceedings resulted in an impermissible punitive and confiscatory order, and thus the judgment should be modified. We discuss this claim below.

-10-

the running of the back pay period by providing alternate dates and a rationale. Nor did it sufficiently explain the basis for its claim that eight employees were strike replacement workers not entitled to the earnings and benefits of the 1991-1993 collective bargaining agreement. As for the Regional Director's allegation that Elworthy and Pelletier were glassworkers, it was not enough for Harding simply to deny that this was so. As the Board noted, Harding did not explain what jobs these employees performed, if they were not glassworkers. Nor did the company state the basis for its disagreement with the job classification alleged in the compliance specification.

Under the Board's rules, when a respondent fails to deny allegations with the required specificity, those allegations are "deemed to be admitted to be true, and may be so found by the Board without the taking of evidence supporting such allegation[s], and the respondent shall be precluded from introducing any evidence controverting the allegation[s]." Id. § 102.56(c). Harding had fair notice of the costs of its evasiveness. The Board was justified in striking portions of Harding's answer and awarding partial summary judgment based on the allegations that were deemed admitted to be true.

Harding nonetheless complains of the sua sponte nature of the Board's award of summary judgment on issues that the Regional Director was prepared to litigate. Harding never raised a word of

-11-

protest about the sua sponte nature of the ruling to the Board, though it could have sought reconsideration on this basis. We will not hear such a procedural objection for the first time. See 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); see also Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665 (1982); E.C. Waste, Inc. v. NLRB, 359 F.3d 36, 41 (1st Cir. 2004).

Somewhat different is Harding's argument that the Board erred in requiring it to make contributions of over $360,000 to four union funds. The company asserts broadly that it offered health insurance coverage to the employees during this period and so it would be a windfall to the funds to pay back to them the full amount of the contributions Harding withheld. Harding asserts that it should be able to offset the contributions it made for the health plan it unilaterally established for employees against the ordered payments to union funds.

This court has not addressed this issue, on which the circuit courts appear to have differing views. One court of appeals apparently has taken the view that the company is not entitled to an offset because it was the company's unlawful choice to set up a private substitute insurance program. See Stone Boat Yard v. NLRB, 715 F.2d 441, 446 (9th Cir. 1983). Under such an

-12-

approach, Harding's contributions to a separate insurance program are immaterial, and its evidence is irrelevant.

In NLRB v. Coca-Cola Bottling Co. of Buffalo, 191 F.3d 316 (2d Cir. 1999), the court held that make-whole remedial relief may include contributions to union funds insofar as the employees have a future interest in the financial strength of the funds. Id. at 324. Under the Coca-Cola Bottling rationale, the limitation on the Board's ability to order fund contributions derives from the "essentially remedial" policies of the NLRA. Id.; cf. Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 900 (1984) ("[A] backpay remedy must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices."). This approach is supported by the Board's view that contributions to union funds may be ordered, at least where employees have an interest in the future viability of those funds. See 1849 Sedgwick Realty LLC, 337 N.L.R.B. 245, 248 n.8 (2001) (stating that the Board has never "held that fund contributions may be ordered in the absence of [a future] interest"); Manhattan Eye Ear & Throat Hosp., 300 N.L.R.B. 201, 201-02 (1990) (adopting order of ALJ that company make fund contributions on rationale that employees had "a clear economic stake in the viability of funds to which part of their compensation [was] remitted"), enforcement denied, 942 F.2d 151 (2d Cir. 1991).

In some instances, courts have directed the Board, in circumstances where the employer provided alternative benefits, to permit an employer an opportunity to show that payments to union funds would be punitive, and not remedial. These courts have remanded to permit the company to show that such reimbursement would fail to benefit employees or would result in windfalls to union funds. See Grondorf, Field, Black & Co. v. NLRB, 107 F.3d 882, 888 (D.C. Cir. 1997); Manhattan Eye Ear & Throat Hosp. v. NLRB, 942 F.2d 151, 159-60 (2d Cir. 1991).

We take no position on the issue because Harding failed to provide sufficient facts in support of its argument. At most, the company asserted that the employees in question were provided with health and medical insurance at no cost to them. Harding did not put forward any other relevant facts. The company did not explain how payment to the union funds would fail to benefit employees or would result in a windfall, nor did it assert the specific amount it was seeking as an offset. To the extent (if at all) the argument is viable, it is the employer who bears the burden of putting necessary facts into the record. See Banknote Corp. of Am., 327 N.L.R.B. 625, 625 (1999); see also 29 C.F.R. § 102.56(b)-(c). In the absence of such facts, the company's claim necessarily fails.

-14-

C.        The Board's 2006 Back Pay Award

The Board has broad remedial powers under section 10(c) of the NLRA, 29 U.S.C. § 160(c). Sure-Tan, 467 U.S. at 898-99. The Board has discretion both to determine that back pay is appropriate to restore the economic status quo and to compute the back pay amount. See Va. Elec. & Power Co. v. NLRB, 319 U.S. 533, 540-41 (1943); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 198 (1941).

The only real issue here is the amount of the back pay award. Harding does not dispute the method of calculation. Rather, it argues that the back pay period should be shorter. It attacks the date of June 5, 1996 as the starting point for calculating back pay for replacement employees. The usual rule applies that the Board's findings must stand unless there is no substantial evidence supporting them. See Hosp. Cristo Redentor, Inc. v. NLRB, 488 F.3d 513, 518-19 (1st Cir. 2007). The Board's choice of date is more than adequately supported by the evidence.

The ALJ picked June 5, 1996 on the basis of his determination that the economic strike ended on June 4, 1996. This finding was based on a letter dated June 4, 1996 that Harding received from the Union, which stated that the strike against the company had concluded by January 1, 1994. The reasons given were that (1) all striking employees -- that is, the glaziers -- who were able to work had found other jobs and were not seeking

reinstatement with Harding, and (2) the Union had stopped picketing by that January date.

Despite the fact that the Union's position covered all employees, Harding argued to the Board that the strike was ongoing because it had not received explicit notice of whether one of the striking employees, Charles Jones, had unequivocally abandoned his right to future employment with the company or had made an unconditional offer to return to work for Harding. The Board reasonably rejected the company's argument that the strike continued beyond June 4, 1996.[5] As the company knew from the Union's letter, Jones fit in the category of those who had found other employment. Harding's position is based on a fundamental misapprehension of labor law. It is the union that speaks for its striking employees, and silence from a particular employee can hardly justify the company's position. See Metro. Edison Co. v. NLRB, 460 U.S. 693, 705 (1983) (recognizing that a union may waive a represented employee's right to strike); Plumbers & Pipefitters Local Union No. 520 v. NLRB, 955 F.2d 744, 751 (D.C. Cir. 1992) ("Among the rights that may be modified or waived [by the union] is the right to strike."). The case on which Harding relies, Service

_____

[5] The ALJ used the date of the Union's June 4, 1996 letter as the ending date for the strike, even though the letter's contents indicated that the strike had ended by January 1, 1994. The ALJ's use of the June 4, 1996 date therefore favored Harding.

-16-

Elec. Co., 281 N.L.R.B. 633, 636-37 (1986), has very different facts and is self-evidently inapplicable.

That leaves the company's objection to the back pay award to Tritone for the period from March 28 to April 15, 1994. The Board rejected Harding's argument that Tritone, who performed glazier work when the strike started, was not entitled to back pay at the full contract glazier's rate because he could not upon reinstatement perform the same work that he did prior to the strike. Harding III, 347 N.L.R.B. No. 102, at 1-2.

The Board applied its usual rule that an employee is entitled to reinstatement to the position he was in at the time of the strike unless the company shows changed circumstances. See Transport Serv. Co., 314 N.L.R.B. at 459; cf. NLRB v. Rockwood & Co., 834 F.2d 837, 841 (9th Cir. 1987) (holding that economic striker was "entitled to reinstatement to his former position, to one substantially equivalent, or to one for which he was qualified"). The Board found that the work Tritone performed upon reinstatement was glazier's work, notwithstanding the fact that the work was not the same as before. Harding III, 347 N.L.R.B. No. 102, at 1. The evidence shows that Tritone returned to work in a "temporary modified duty position," as described in a company letter dated March 21, 1994. Tritone also testified before the ALJ that he "measure[d] store fronts" for possible future glass replacement and brought cars back to the workshop during the

applicable period, and that he performed these same tasks as part of his previous work as a glazier. Further, the workers' compensation insurance provided under the collective bargaining agreement supported the characterization of Tritone's post-reinstatement work as glazier's work that was entitled to the full contract rate. Harding's own Modified-Duty Policy provided "<u>full wages</u> for an injured employee during recovery" (emphasis added). Joseph Guiliano, the Union's business manager, also testified that there was never "an agreement with Harding Glass or its representatives that Harding could pay the glaziers less than the full contract rate while they were on any kind of light duty." Again, the Board's order is more than adequately supported.

D.      <u>Delay</u>

Harding argues that it should not have to bear the consequences of the interest payments (at least) accruing during the long pendency of this action. Several different concerns are raised by the delay in this case.

First, those primarily hurt by the delay are those employees who did not receive the back pay or benefits to which they were entitled. See <u>NLRB</u> v. <u>J.H. Rutter-Rex Mfg. Co.</u>, 396 U.S. 258, 264 (1969) ("Wronged employees are at least as much injured by the Board's delay in collecting their back pay as is the wrongdoing employer."). There is no basis to excuse Harding from providing the relief which has been ordered. Delay in a labor proceeding

-18-

cannot be a basis on which to deny a remedy to the victims of the company's unfair labor practice.  See NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 480, 466 U.S. 720, 724-25 (1984) (per curiam) ("It is well established . . . that the Court of Appeals may not refuse to enforce a backpay order merely because of the Board's delay subsequent to that order in formulating a backpay specification."); J.H. Rutter-Rex, 396 U.S. at 265 ("[T]he Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers.").

Second, Harding is itself responsible for delay, as this opinion shows, and so the company has little basis to seek refuge in equitable arguments.  The company has had the use of the money the entire time.  It has also had the option of establishing a reserve to fund its contingent obligation.  In any event, while it is true that the dollar amounts have risen over time, the company has the option of trying to work out a payment plan.

Third, none of this lets the NLRB off the hook for the extraordinary length of time it took to resolve a relatively simple labor issue.  Not only has the delay hurt the employees, it undermines confidence in the agency.  At oral argument, the court directed Board counsel to file a supplemental memorandum explaining measures the agency is taking to improve its compliance procedures to avoid lengthy delays in case processing.  On June 20, 2007, the

-19-

Office of the General Counsel filed a letter with us outlining four measures the agency has taken to reduce delays in compliance proceedings.  We hope that such egregious delay will not recur.

We grant the Board's petition for enforcement.