NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

RELIANCE FUEL OIL CORPORATION,
Respondent.

No. 15, Docket 26806.

United States Court of Appeals
Second Circuit.

Argued Sept. 29, 1961.

Decided Nov. 13, 1961.

Rehearing Denied Jan. 4, 1962.

Melvin Pollack, Atty., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Samuel H. Borenkind, New York City, for respondent.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

This is a petition of the National Labor Relations Board, pursuant to Section 10(e) of the amended National Labor Relations Act, 29 U.S.C.A. § 160(e), for enforcement of a Board order issued against respondent January 5, 1961 reported at 129 NLRB No. 141. Since the alleged unfair practices occurred in Massapequa, Long Island, New York, within this judicial circuit, this court has jurisdiction over the petition for enforcement under Section 10(e). Enforcement denied. Remanded for taking of further evidence and making of additional findings.

Respondent is engaged in the sale of fuel oil for heating purposes and in servicing oil burners and boilers. All of its customers are home owners located in the State of New York. During the calendar year 1959 the respondent purchased from Gulf Oil, which is concededly engaged "in commerce," fuel oil and related products valued at more than $650,000. The largest part of the product sold to respondent is refined outside the State of New York and delivered into Gulf's storage tanks in New York, from where it is shipped to Gulf's stationary storage tanks at Oceanside, Long Island without segregation according to customers. Respondent's trucks withdraw the oil from the Oceanside tanks and deliver it directly to customers.[1]

The respondent employs two principal groups of workers: oil burner service employees numbering approximately 10, and fuel oil drivers numbering approximately 11.

On September 28, 1959, Local 553 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, filed a petition with the Board in Case No. 2–RC–10280, seeking to represent a unit of respondent's servicemen which was later changed to include drivers as well. Previously, in the summer of 1958, Local 355 of the Retail, Wholesale and Department Store Union, AFL–CIO, had unsuccessfully attempted to organize the employees of respondent. Pursuant to the representation petition an election was held; Local 553 received 10 votes, Local 355 received 6 votes, one vote was cast for neither union and four votes were challenged.

Immediately after the election a so-called "shape-up" system was instituted carrying out a threat to institute such a system if Local 553 won the election and the extra-gallonage bonus previously paid drivers was discontinued. On February 14, 1960, Union President Flatow sent a letter to Packman, an officer of the respondent, stating that Local 355 represented a majority of the employees and demanding contract negotiations. The following day a meeting was held and after a cursory examination of the signatures on membership cards held by Local 355 a contract was entered into, immediately following which the "shape-up" system was discontinued and the drivers reimbursed for wages lost. Thereafter the respondent withheld $140.00 in dues from employees' wages and remitted this sum to Local 355 during the period February 23 to April 5, 1960. The Board certified Local 553 on March 15, 1960, as the exclusive representative of respondent's employees pursuant to the findings of the Regional Director overruling the challenges to two of the challenged votes. Asserting that the employees had chosen another union, with whom a contract had been signed, respondent refused to bargain collectively with Local 553.

The Board concluded that by its threats, promises, and changes in working conditions for the purpose of influencing the choice of a collective bar-

1. The Board also found that respondent draws a certain amount of oil from other firms' tanks on a barter basis and that a portion of its purchases of truck parts is made outside of New York State which totals "a couple of hundred dollars at the most." As the Board did not rest its jurisdiction on these factors they will not be considered by the court.

gaining agent respondent violated Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1); and that by recognizing and entering into a collective bargaining agreement with Local 355 respondent violated Section 8(a) (2) and (1) of the Act, 29 U.S.C.A. § 158(a) (2) and (1), by rendering unlawful assistance. Moreover respondent's agreement to, and enforcement of, a contract provision which required membership in the unlawfully assisted union as a condition of employment violated Section 8(a) (3), (2) and (1) of the Act, 29 U.S.C.A. § 158(a) (3), (2) and (1). Finally, the Board concluded that respondent was guilty of a refusal to bargain in violation of Section 8(a) (5) and (1) of the Act, 29 U.S.C.A. § 158(a) (5) and (1).

The Board ordered respondent to cease and desist from the unfair labor practices found and from interfering, in any other manner, with the rights of employees guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157. The Board also ordered respondent to withhold recognition from Local 355 and to cease giving effect to the bargaining agreement with it, unless and until that union is certified by the Board; to reimburse its employees for the dues checked off; and upon request to bargain collectively with Local 553.

Respondent resists enforcement on two grounds: (1) the Board failed to show any evidence of coercion; and (2) the Board was without jurisdiction of the subject matter since there was no showing of an effect upon commerce.

Granger, one of respondent's servicemen, testified that Packman, respondent's secretary and treasurer, pursued a course of conduct which was calculated to coerce the employees to reject Local 553 in favor of Local 355. Respondent attempts to meet this testimony by arguing that Granger was biased and inconsistencies in his testimony show he was unworthy of belief. But this is a question of credibility as to which the Board is normally the sole judge.[2] Moreover, Granger's testimony is corroborated by that of Benjamin Mendolia,[3] Kershow,[4] Graziano,[5] Sammis,[6] and Joseph Mendolia.[7]

■ The findings on the merits are adequate and adequately supported by substantial evidence. Reimbursement is appropriate under these circumstances. The Board's order, including the provision for reimbursement, must therefore be enforced if the Board had jurisdiction over the dispute.[8]

The Board appears to assume that any employer, whose business exceeds the Board's "jurisdictional" minimum of $500,000, who purchases materials from storage within the state the origin of which is without the state, if involved in a labor dispute necessarily affects commerce within the meaning of the Act.

The findings of the Board on effect on commerce here, perhaps because of reliance on N. L. R. B. v. Pease Oil Co., 279

---

2. E. g., N. L. R. B. v. Morris Fishman & Sons, Inc., 278 F.2d 792 (3 Cir.1960); N. L. R. B. v. Steel, Metals, Alloys and Hardware Fabricators and Warehousemen, Local 810, 274 F.2d 688 (2 Cir. 1960); Paramount Cap Mfg. Co. v. N. L. R. B., 260 F.2d 109 (8 Cir.1958).

3. Stenographic Transcript of Testimony, 113.

4. Id. at 81–3.

5. Id. at 137.

6. The witness stated that Packman told him that "You see what's happened to the drivers, and you men haven't been hurt as yet." Id. at 55.

7. 146–8.

8. Since the Board's finding of coercion in the selection of a representative is amply supported by the evidence it is unnecessary to discuss respondent's contention that it was required to bargain with Local 355 which was found to be an employer-assisted union. N. L. R. B. v. Revere Metal Art Co., 280 F.2d 96, 99–100 (2 Cir.1960). Even if the employees underwent a genuine change of attitude based upon a self-induced reappraisal they would be unable to repudiate informally the outcome of the election, at least after certification, for a reasonable period. Brooks v. N. L. R. B., 348 U.S. 96, 75 S. Ct. 176, 99 L.Ed. 125 (1954).

F.2d 135 (2 Cir.1960), are quite meager consisting of the following:

"The respondent is a New York corporation, with its principal office and place of business in Massapequa, . Long Island, New York. It is engaged in the business of selling fuel oil for heating purposes, and servicing oil burners and boilers. All its customers are home owners located in the State of New York. During the fiscal year ending June 30, 1959, the Respondent's gross sales exceeded $500,000. During the calendar year 1959 the Respondent purchased from Gulf Oil Corporation, herein called Gulf, fuel oil and related products valued at more than $500,000. Most of the product delivered to the Respondent is refined outside the State of New York and delivered into Gulf's storage tanks at New York, New York. It is then transferred to Gulf's stationary storage tanks at Oceanside, Long Island, New York, without segregation according to customers. The Respondent's trucks load oil from Gulf's Oceanside tanks, and from there deliver it either directly to the Respondent's customers, or to the Respondent's tanks at Massapequa, from which it is later withdrawn and delivered to customers. The Respondent also obtains some fuel oil by exchange with other fuel oil companies on Long Island. This operates as follows: The Respondent draws a certain amount of oil from the other firm's tanks; conversely the other firm draws the same amount of oil from the Respondent's tanks. It is a barter operation, without the payment of money. The Respondent has on occasions obtained truck parts directly from outside the State of New York. In 1959, these purchases totaled 'a couple of hundred dollars at the most.' Other than this, the Respondent made no purchases of any kind directly from outside the State.

"Gulf is engaged in the nonretail and retail sale of fuel oils and related products. It operates in New York and in other States. Its gross sales and operating revenues in 1959, including consumer excise taxes, amounted to in excess of $3,170,-000,000. The Respondent and the Party to the Contract concede, and I find, that at all material times Gulf was engaged in commerce within the meaning of Section 2(6) and (7) of the Act."

These findings are based on this statement by the Law Department of Gulf:

"Gulf Oil Corporation is engaged in non-retail and retail business; sales and other operating revenues (including consumer excise taxes) for 1959 according to Annual Report amounted to $3,170,847,000.

Question No. 1: What was the gross amount of sales of all items sold to Reliance Fuel Oil Corp. during a twelve-month period?

Answer: For the year 1959: $669,805.

Question No. 2: Were most of the products sold by Gulf Oil Corp. to Reliance received by Reliance from sources outside the State of New York?

Answer: At present time, most of product delivered to Reliance is refined outside state and delivered into Gulf's terminal storage within state (New York City); redelivered into local Gulf storage on Long Island (not segregated for this customer); again redelivered to customer at or from Gulf's local Long Island storage."

The Supreme Court, however, seems never to have gone so far as to hold that mere size of a local business or amount of its purchases within the state of materials the origin of which was outside the state, without relation to other factors necessarily brings it within the Act.

In Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 59 S.Ct. 206, 214,

83 L.Ed. 126 (1938) the Court declined to place its holding on the purchases of oil, coal, etc., although very large, which came from without the state.

"[W]hether or not particular action in the conduct of intrastate enterprises does affect that commerce in such a close and intimate fashion as to be subject to federal control, is left to be determined as individual cases arise."

Black, J., concurring in Polish Nat. Alliance of U. S. of North America v. National Labor Relations Board, 322 U.S. 643, 652, 64 S.Ct. 1196, 1201, 88 L.Ed. 1509 (1944):

"The doctrine that Congress may provide for regulation of activities not themselves interstate commerce, but merely 'affecting' such commerce, rests on the premise that in certain fact situations the federal government may find that regulation of purely local and intrastate commerce is 'necessary and proper' to prevent injury to interstate commerce. Houston, E. & W. T. Ry. Co. v. United States, 234 U.S. 342 [34 S.Ct. 833, 58 L.Ed. 1341]; Second Employers' Liability Cases, Co., 223 U.S. 1, 46–47, [32 S.Ct. 169, 56 L.Ed. 327]; and see Wickard v. Filburn, 317 U.S. 111, 121, [63 S.Ct. 82, 87 L.Ed. 122]. In applying this doctrine to particular situations this Court properly has been cautious, and has required clear findings before subjecting local business to paramount federal regulation. City of Yonkers v. United States, 320 U.S. 685 [64 S.Ct. 327, 88 L.Ed. 400], and cases therein cited. It has insisted upon 'suitable regard to the principle that, when-ever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear.' Id.; Florida v. United States, 282 U.S. 194, 211–212 [51 S.Ct. 119, 75 L. Ed. 291]; cf. Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 196–197 [61 S.Ct. 845, 85 L.Ed. 1271]; Securities & Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 92–95 [63 S.Ct. 454, 87 L.Ed. 626]."

The Supreme Court has stated that the Congress used the full extent of its power under the commerce clause in this legislation. Polish Nat. Alliance v. National Labor Relations Board, supra, at 647. The Court has never, however, held that local regulation of labor relations in local commerce was completely superseded. At the time of enactment of the Wagner Act the Congress was not sure of the limits of its power. Since the courts had defined commerce quite broadly in the interests of employers affected by strikes of miners and stone cutters, it was felt that regulation of labor relations could be upheld in industries affecting commerce on the same basis.[9] The limits of the concept "affecting commerce" have since been defined by the Supreme Court on a case by case basis in a number of instances.[10] The federal field, in the process of definition has appeared to be steadily expanding. See Cox, Federalism in the Law of Labor Relations, 1954, 67 Harvard Law Review 1297. It may be that eventually the Congress will attempt more specifically to define the limits. As yet we cannot be certain of the extent of the exercise of federal power, but must take each case

9. 79 Cong.Rec. 9682 (Rep. Connery), 74th Cong., 1st Sess. (1935).

"The Supreme Court has said again and again, in the Coronado case and in the Stonecutters case that anything that affects interstate commerce, as far as a labor dispute is concerned, which burdens or obstructs interstate commerce, can be regulated under the commerce clause of the Constitution."

10. E. g., N. L. R. B. v. Jones & Laughlin Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); N. L. R. B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014 (1939); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); Howell Chevrolet v. N. L. R. B., infra; Polish National Alliance v. National Labor Relations Board, supra.

as it comes up and fit it into the framework so far constructed.

On this question the Board relies on two cases in this circuit, N. L. R. B. v. Van Deusen, 138 F.2d 893, 895 (2 Cir. 1943), N. L. R. B. v. Pease Oil Co., supra, and on N. L. R. B. v. Townsend, 185 F.2d 378 (9 Cir.1950). None of these furnish very reliable support to the Board. In Van Deusen there was business in interstate commerce involved, or alternatively an effect on commerce by diversion of goods from interstate to intrastate business to replace production halted by the dispute. In Pease Oil the point as to affecting commerce was not considered. Townsend, an automobile retailer case, does use broad language supporting the Board's claim here. The Supreme Court, however, in Howell Chevrolet Co. v. N. L. R. B., 346 U.S. 482, 74 S.Ct. 214, 98 L.Ed. 215 (1953), in affirming another 9th Circuit case which had cited Townsend, N. L. R. B. v. Howell Chevrolet Co., 204 F.2d 79 (9 Cir.1953), relied almost wholly on the interdependence of Howell's local and General Motors' national activities due to the detailed supervision permitted by the agency agreement.

■ It may be that today the Court would answer in the affirmative the question it left pending in Consolidated Edison. In view of the caution expressed in Howell, and in the concurring opinion in Polish Alliance, however, we may be sure that a reasonably complete picture of the manner in which a work stoppage would affect commerce should be required before we rule on the jurisdictional issue. We cannot tell from the meager record before us anything about the volume of commerce in heating oils in the relevant market, Gulf's participation therein, Reliance's contract relationship, if any, with Gulf's national distribution system, Reliance's proportion of Gulf's commerce in the relevant market, or the number and availability of alternate distributors

to Gulf and to Reliance's customers.[11] While volume of commerce affected is not in itself material, such factual findings might well throw light upon the manner in which a stoppage at Reliance would affect commerce, if at all. We therefore decline to enforce the order at this time upon the record before us. Compare N. L. R. B. v. Mid-Co Gasoline Co., 172 F.2d 974 (5 Cir.1949), Stauffer v. Exley, 184 F.2d 962, 967–68 (9 Cir.1950). The case is remanded to the Board with instructions to take further evidence and make further findings on the manner in which a labor dispute at Reliance affects or tends to affect commerce.

On Motion of N. L. R. B. for Rehearing

Petition for rehearing denied.

■ Section 2(7) of the National Labor Relations Act defines "affecting commerce" as "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." Therefore, if the employer is himself engaged in interstate commerce, without more the jurisdiction of the Board is established. If the employer is not engaged in interstate commerce, the acts in question must lead or tend to lead to a dispute which must burden or obstruct the free flow of interstate commerce. We believe that in enacting this double test Congress intended the courts to examine whether or not a labor dispute involving only employers not engaged in interstate commerce did or did not directly or indirectly burden or obstruct interstate commerce. Had Congress meant to give the Board jurisdiction of all labor disputes involving employers who purchased more than a *de minimis* amount of supplies which had at one time moved in interstate commerce, it would have been easy enough to say so.

The case of Wickard v. Fillburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122

---

11. While we are aware that alternative sources of supply do not necessarily negate a finding of jurisdiction, N. L. R. B. v. Bradford Dyeing Ass'n, 310

U.S. 318, 326, 60 S.Ct. 918, 84 L.Ed. 1226 (1940), it seems essential that the court be enlightened as to the factual relationships involved.

(1942), urged upon us by the Board's petition for rehearing is inapplicable here. In that case the Supreme Court was dealing with a statute which was clearly broad enough to apply to the defendant's activities, and the only question before the court was the constitutionality of that statute. In the case at bar, the constitutionality of regulating the defendant's labor dispute is clear, and we are faced with a question of statutory interpretation. In the resolution of this question, the findings called for in the opinion are required.