ELECTRICAL CONTRACTORS, INC.,
Petitioner–Cross–Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent–Cross–
Petitioner.

Docket Nos. 00–4189, 00–4161.

United States Court of Appeals,
Second Circuit.

Argued Jan. 31, 2001.
Decided March 28, 2001.

Steven B. Kaplan, Michelson, Kane, Royster & Barger, P.C., Hartford, CT, for Petitioner–Cross–Respondent.

Jeffrey L. Horowitz, Attorney, National Labor Relations Board (Leonard R. Page, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, on the brief), Washington, DC, for Respondent–Cross–Petitioner.

Before STRAUB, POOLER, and SACK, Circuit Judges.

STRAUB, Circuit Judge:

Petitioner–Cross–Respondent Electrical Contractors, Inc. ("ECI") petitions this Court to set aside a decision and order by Respondent–Cross–Petitioner, the National Labor Relations Board ("NLRB" or the "Board"), finding that ECI had engaged in unfair labor practices in violation of Section 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), by coercing employees to sign anti-union letters addressed to the Connecticut Department of Labor ("DOL") in the presence of their supervisors and threatening to retaliate against at least one employee who initially refused to sign such a letter. The Board cross-petitions for enforcement of its order requiring ECI to cease and desist from its unfair labor practices, to notify the government agencies and other entities that received the anti-union letters that the letters were null and void and to be given no effect, and to post remedial notices to its employees. For the reasons that follow, we deny ECI's petition and grant the Board's cross-petition for enforcement of its order.

## BACKGROUND

ECI is a nonunion contractor that installs electrical systems on construction sites throughout the state of Connecticut. Since 1986, Local 90, International Brotherhood of Electrical Workers, AFL–CIO ("Local 90") has been engaged in an attempt to unionize ECI's workforce. As part of its effort to organize the ECI workforce, Local 90 compiled a mailing list of ECI employees derived from certified payroll records that were maintained and publicly filed by ECI as required by the state prevailing wage law, CONN. GEN.STAT. § 31–53(f) (1997), and obtained by Local 90 under the Connecticut Freedom of Information Act ("CFOIA"),[1] CONN. GEN.STAT. § 1–212. Upon obtaining copies of ECI's certified payroll records, Local 90 sent information about the union and the prevailing wage regulations—including the wage rates that ECI was obligated to pay under those regulations, the wage rates and ben-

---

1. Section 31–53(f) of the Connecticut General Statutes requires all employers that are subject to state prevailing wage requirements to "keep, maintain and preserve such records relating to the wages and hours worked by each employee ... in such a manner and form as the Labor Commissioner establishes" and to "submit monthly to the contracting agency a certified payroll which shall consist of a complete copy of such records accompanied by a statement signed by the employer" indicating, *inter alia,* that the records are accurate and that the prevailing wage rate has been paid to each of the contractor's employees. CONN. GEN.STAT. § 31–53(f). The certified payroll records filed by the contractors are public records, and under the prevailing wage law "every person shall have the right to inspect and copy such records in accordance with the provisions of section 1–212 [the Connecticut Freedom of Information Act]." *Id.*

efits that ECI actually claimed to be paying in its publicly filed and certified payroll records, and information on how to pursue state law remedies in the event of wage disputes—to the employees listed in ECI's certified payroll records.[2] This information was sent by Local 90 in the name of the Connecticut Labor Management Cooperative Committee ("CLMCC"), a joint labor-management organization with which Local 90 is affiliated.

Beginning in May 1999, ECI initiated a campaign to transmit letters to the Connecticut Department of Labor ("DOL") from its employees objecting to the disclosure of ECI's payroll information to Local 90. The decision to commence this effort was made by ECI's owner and president, Lou Bona, in response to Local 90's correspondence to ECI's employees. With the assistance of counsel, Bona drafted a form letter that was distributed to ECI's employees for their signatures. The signed letters were then collected and forwarded to the DOL Commissioner. The ECI employee responsible for maintaining payroll records, Jan Berry, instructed supervisors to obtain signatures on the form letters from their employees, characterizing the initiative as an effort to send a "petition" to DOL. The letters were prepared for distribution to and signature by the employees at each of ECI's work sites, and the employees' signatures actually were solicited at all of the ECI work sites except for one.

For example, on May 13, 1999, a project manager, Cliff Clausen, distributed sets of papers to eight employees during their lunch break, including the form letter addressed to the DOL Commissioner, and stated, "Here, I have this paper that I need you guys to sign for me." When

asked what the letter regarded, Clausen replied, "It's a letter we're going to send to our lawyer to get the union off our back." The letter explicitly complained about DOL's disclosure of "personal and confidential employment and financial information" to Local 90 and about the correspondence from the CLMCC, describing that organization as an "outfit [that] is simply a front for the electrical workers union" and characterizing that correspondence as "nothing more than harassment, as well as an insult to my intelligence." The letter attributed to its signatories the following view: "I am not a member of that union. I do not want to become a member of that union. I work for a merit shop, non-union contractor, by my free choice, and am very happy doing so." The letter closed by insisting that the signatories be informed in writing "before my personal and confidential employment information is released to anyone" (emphasis omitted).

After distributing copies of the letter addressed to DOL, Clausen then proceeded to distribute copies of a second document, stating, "I need you to sign this too, it just says that you weren't forced to sign this first letter." The first page of that stapled, two-page document explained ECI management's motivation for requesting its employees to sign the letter addressed to DOL:

> We need to get as many of these letters as possible signed—we are doing this in an effort to stop the D.O.L. and any one [sic] else from releasing *YOUR* personal information contained on the certified payroll forms to any one [sic] who asks for it.
>
> Upon signature return to Jan—we will type in your names and addresses

---

**2.** Local 90 represents that certified payroll records do not include employees' telephone numbers, and that social security numbers typically are redacted on the copies of those records that are obtained under the Freedom of Information Act.

on the heading and forward them—in one big package to the commissioner.

We have got to put a stop to this.

In relevant part, the second page—bearing the header, "NON–REPRISAL NO-TICE"—purported to release the employees from any obligation to sign the letter:

You do *not* have to sign and transmit the attached letter to the department [sic] of Labor.

There will be no reprisals if you choose not to sign and transmit the attached letter. Your position on this issue will not subject you to any reprisal from ECI, nor will your position result in any benefit being given to you by ECI.

However, at least one employee, Jose Oliveira, refused to sign the letter when the documents were distributed and, as a result, was paged by Clausen later that afternoon. When Oliveira called Clausen in response to that page, Clausen directed Oliveira to "just sign it."

Ultimately, 83 out of ECI's approximately 100 employees actually signed the letters that ECI had prepared, and upon receipt of the signed letters ECI bundled and mailed them together to the DOL Commissioner.[3] Thereafter, Local 90 requested from the Town of Hamden, pursuant to the CFOIA, ECI's prevailing wage payroll records. That request was denied; the Town of Hamden offered instead to provide copies of those payroll records with the employees' names and addresses redacted. Local 90 formally filed a complaint regarding this incident with the State Freedom of Information Commission; that complaint was still pending at the time of the hearing before the administrative law judge. A similar incident occurred involving the Town of Norwich, which, after initially denying Local 90's CFOIA request, provided the prevailing wage records after intervention by the DOL Commissioner.

On June 22, 1999, Local 90 brought an unfair labor practice charge against ECI to the National Labor Relations Board. In its amended charge, filed on September 20, 1999, Local 90 maintained that ECI

interfered with, restrained and coerced employees in the exercise of the right guaranteed by Section 7 of the Act by soliciting employees to sign letters expressing opposition to the International Brotherhood of Electrical Worker, [sic] a labor organization, and by interrogating employees regarding the [sic] union activities and sympathies.

After investigating Local 90's allegations, the NLRB General Counsel brought a complaint upon that charge on September 24, 1999. In its answer to the Board's complaint, ECI admitted that it was a Connecticut corporation with its place of business in Hartford, that it had been engaged in the business of providing electrical contracting services, that it had performed services valued in excess of $50,000 to customers located outside of Connecticut during the prior twelve months, and that it was an employer engaged in commerce within the meaning of NLRA §§ 2(2), (6), and (7), 29 U.S.C. §§ 152(2), (6), and (7). However, ECI denied that the company had interfered with or coerced its employees in the exercise of their rights under NLRA § 7, or that any such conduct had affected commerce within the meaning of NLRA § 2(6) and (7).

A hearing was held in Hartford before an administrative law judge on December 15, 1999. On April 14, 2000, the ALJ issued a Decision and Order finding that

---

**3.** Copies of the signed letters were also forwarded to the Connecticut Department of Transportation, several townships, and general contractors with whom ECI worked.

ECI had improperly solicited its employees to express opposition to being contacted or represented by the Union and therefore had engaged in unfair labor practices affecting commerce, in violation of NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), by "interrogat[ing] its employees and interfer[ing] with, restrain[ing], and coerc[ing] them in the exercise of their" rights under NLRA § 7, 29 U.S.C. § 157. The ALJ recommended that the Board issue an order requiring ECI to cease and desist from interrogating its employees about union support or union activities, soliciting employees to sign letters in opposition to Local 90 or any other labor organization, threatening any employee with reprisals for failing to sign letters expressing opposition to the Union, or otherwise interfering with employees' exercise of rights guaranteed by NLRA § 7. The recommended order also required ECI to notify all recipients of the unlawfully solicited letters that those letters were "null and void and to be given no effect," and to post conspicuously at its Hartford facility a notice to its employees pledging not to infringe upon their rights under NLRA § 7.

Jurisdiction was transferred to the NLRB on April 14, 2000, and on June 7, 2000, ECI filed exceptions to the jurisdictional findings and remedial scope of the ALJ's decision and order. ECI's exceptions did not challenge the merits of the ALJ's findings and conclusions. In a decision and order entered on July 21, 2000, the NLRB affirmed the ALJ's conclusions and adopted his recommended order. *See Electrical Contractors, Inc.,* No 34–CA–8911, 331 NLRB No. 100 (July 21, 2000). ECI filed a petition for review on August 4, 2000, and the NLRB filed a cross-application for enforcement of its order on September 13, 2000.

## DISCUSSION

 In its petition for review, ECI challenges only (1) the Board's statutory jurisdiction under NLRA § 10(a), 29 U.S.C. § 160(a), to prevent the unfair labor practices alleged to have been committed in this case and (2) the Board's exercise of remedial authority under NLRA § 10(c), 29 U.S.C. § 160(c). ECI does not challenge the ALJ's substantive findings that the company's actions constituted unfair labor practices in violation of NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), and did not advance any such challenge in its exceptions to the ALJ's decision. As such, ECI has failed to preserve any such claims for review. *See* NLRA § 10(e), 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board ... shall be considered by the [Court of Appeals], unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *see also* 29 C.F.R. § 102.46(g) ("No matter not included in exceptions or cross-exceptions may thereafter be urged before the Board, or in any further proceeding."). To the extent that ECI's challenges to the Board's jurisdiction and exercise of remedial authority require us to review those underlying conclusions on the merits, ECI's claims are waived under NLRA §§ 10(e) and 10(f), and we lack jurisdiction to review those findings. *See Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 666, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982); *KBI Sec. Serv., Inc. v. NLRB,* 91 F.3d 291, 294 (2d Cir.1996); *NLRB v. Erlich's 814, Inc.,* 577 F.2d 68, 69 n. 2 (8th Cir.1978); *but see May Dept Stores Co. v. NLRB,* 326 U.S. 376, 386 n. 5, 66 S.Ct. 203, 90 L.Ed. 145 (1945); *NLRB v. Revere Metal Art Co.,* 280 F.2d 96, 105 (2d Cir.1960).

## I. The Board's Statutory Jurisdiction Under NLRA § 10(a)

ECI asserts two distinct challenges to the Board's statutory jurisdiction under

the NLRA. First, ECI argues that the NLRB lacked jurisdiction over the General Counsel's complaint against the company because the Board failed to prove that the unfair labor practices charged by Local 90 and the General Counsel had "affect[ed] commerce" within the meaning of NLRA §§ 2(6)-(7), 8(a)(1), and 10(a), 29 U.S.C. §§ 152(6)-(7), 158(a)(1), 160(a). Second, ECI asserts that the Board incorrectly concluded that Local 90, the charging party, was a "labor organization" within the meaning of NLRA § 2(5), 29 U.S.C. § 152(5), and that the Board consequently lacked jurisdiction.

In reviewing the Board's factual findings, including those in support of its exercise of jurisdiction, we must determine whether they are supported by "substantial evidence" in light of the record as a whole. *See* NLRA § 10(e) & (f), 29 U.S.C. § 160(e) & (f); *Schnurmacher Nursing Home v. NLRB,* 214 F.3d 260, 265 (2d Cir.2000); *AT&T v. NLRB,* 67 F.3d 446, 451 (2d Cir.1995); *Erlich's 814, Inc.,* 577 F.2d at 70. "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Schnurmacher,* 214 F.3d at 265 (quoting *id.*). We afford the Board " 'the greatest deference' " and "a degree of legal leeway when it interprets" the NLRA, *NLRB v. Town & Country Elec., Inc.,* 516 U.S. 85, 89–90, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995) (quoting *ABF Freight Sys., Inc. v. NLRB,* 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994)), and we review its legal conclusions to ensure that they have a "reasonable basis in law." *AT&T,* 67 F.3d at 451 (quoting *NLRB v. Windsor Castle Health Care Facilities,* 13 F.3d 619, 622 (2d Cir.1994)); *see also NLRB v. Local Union No. 103, Int'l As-*

*soc. of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 350, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) (Board's interpretation of NLRA is "entitled to considerable deference" when it "represents a defensible construction of the statute"). While we review mixed questions of fact and law *de novo,* "we defer to the Board's decision when there appears to be more than one reasonable resolution and the Board has adopted one of these." *Sheridan Manor Nursing Home, Inc. v. NLRB,* 225 F.3d 248, 252 (2d Cir.2000).

A. *The Board's Jurisdiction Under NLRA § 10(a) to Prevent Unfair Labor Practices "Affecting Commerce"*

ECI's first jurisdictional challenge raises a question of statutory interpretation concerning the degree to which unfair labor practices must "affect[ ] commerce" to be within the Board's statutory jurisdiction. Section 10(a) of the NLRA confers jurisdiction upon the Board "to prevent any person from engaging in any unfair labor practice ... affecting commerce." NLRA § 10(a), 29 U.S.C. § 160(a). "Commerce" is defined under the NLRA to mean

trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

NLRA § 2(6), 29 U.S.C. § 152(6). This definition of "commerce" has been construed to refer to "interstate and foreign commerce in the constitutional sense" contemplated by the Commerce Clause of the

U.S. Constitution, U.S. Const. art. I, § 8, cl. 3. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 31, 57 S.Ct. 615, 81 L.Ed. 893 (1937). "Affecting commerce," in turn, is defined under the NLRA to mean "[1] in commerce, or [2] burdening or obstructing commerce or the free flow of commerce, or [3] having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." NLRA § 2(7), 29 U.S.C. § 152(7).

It long has been established that by conferring jurisdiction upon the NLRB "to prevent any person from engaging in any unfair labor practice ... affecting commerce," NLRA § 10(a), 29 U.S.C. § 160(a), "Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963) (per curiam); *see Guss v. Utah Labor Relations Board*, 353 U.S. 1, 3, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957) ("By this language [in NLRA § 10(a) ] and by the definition of 'affecting commerce' elsewhere in [NLRA § 2(7) ], Congress meant to reach the full extent of its power under the Commerce Clause."); *Polish Nat'l Alliance of the United States v. NLRB*, 322 U.S. 643, 647, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944) ("Congress in order to protect interstate commerce from adverse effects of labor disputes has undertaken to regulate all conduct having such consequences that constitutionally it can regulate."); *NLRB v. Fainblatt*, 306 U.S. 601, 607, 59 S.Ct. 668, 83 L.Ed. 1014 (1939) ("The [NLRA] on its face thus evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce by the adoption of measures for the prevention or control of certain specified acts—unfair labor practices— which provoke or tend to provoke strikes

or labor disturbances affecting interstate commerce."). Whether unfair labor practices "would in particular situations adversely affect commerce" is a matter to be determined by the Board. *Polish Nat'l Alliance*, 322 U.S. at 648, 64 S.Ct. 1196; *cf. Jones & Laughlin Steel Corp.*, 301 U.S. at 32, 57 S.Ct. 615. In making that determination, the Board is obliged to judge any adverse effect on commerce with reference to "the full reach of the constitutional power of Congress," rather than "by confining judgment to the quantitative effect of the activities immediately before the Board. Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce." *Polish Nat'l Alliance*, 322 U.S. at 648, 64 S.Ct. 1196; *see NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 683–85, 71 S.Ct. 943, 95 L.Ed. 1284 (1951) (affirming Board's assertion of jurisdiction over activities taking place at local construction site based on finding that "any widespread application of the practices charged might well result in substantially decreasing" the flow of interstate commerce); *Fainblatt*, 306 U.S. at 607, 59 S.Ct. 668 (operation of NLRA does not "depend on any particular volume of commerce [a]ffected more than that to which courts would apply the maxim *de minimis*"); *NLRB v. Marsden*, 701 F.2d 238, 241 (2d Cir.1983) (statutory jurisdiction of the NLRB "extends to essentially local enterprises which only indirectly affect interstate commerce so long as that effect is more than *de minimis*").

In its Complaint, Local 90 alleged that ECI, in the course of conducting its electrical contracting services business, "performed services valued in excess of $50,000 directly to customers located outside the

State of Connecticut" and that "[a]t all material times, [ECI] ha[d] been an employer engaged in commerce" within the meaning of NLRA § 2(2), (6), & (7), 29 U.S.C. § 152(2), (6), & (7). ECI specifically admitted both of these allegations in its Answer. However, ECI also specifically denied Local 90's allegation that ECI's unfair labor practices "affect[ed] commerce" within the meaning of NLRA § 2(6), (7). As it did before the ALJ, ECI emphasizes its denial of the Board's claim that ECI's alleged unfair labor practices "affected commerce" in order to argue that the Board, having failed to present any evidence in support of that claim, consequently lacked jurisdiction under the terms of NLRA § 10(a). The ALJ rejected this argument, holding that ECI's admission that it is an employer engaged in commerce within the meaning of the NLRA is sufficient to establish that any unfair labor practices that ECI may have committed necessarily "affect[ed] commerce" within the meaning of NLRA §§ 2(7) and 10(a).

■ We agree with the ALJ and the Board that since ECI is engaged in commerce within the meaning of NLRA § 2(6), any unfair labor practices committed by ECI necessarily "affect[ed] commerce" within the meaning of NLRA §§ 2(7) and 10(a) and, therefore, that any unfair labor practices that ECI may have committed were within the Board's statutory jurisdiction to prevent. ECI's argument misunderstands the nature of the nexus to commerce required by NLRA § 10(a). Based on a straightforward application of the definition of "affecting commerce" provided in NLRA § 2(7), the Board has jurisdiction to prevent alleged unfair labor practices once it establishes either (1) that the unfair labor practices in question themselves are "in commerce," or (2) that they "burden[ ] or obstruct[ ] . . .

the free flow of commerce," or (3) that they "hav[e] led or tend[ ] to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." NLRA § 2(7), 29 U.S.C. § 152(7) (defining "affecting commerce" for purposes of NLRA); see Reliance Fuel Oil Corp., 371 U.S. at 227, 83 S.Ct. 312 (by virtue of its engagement in commerce, employer's "operations and the related unfair labor practices 'affected' commerce, within the meaning of the [NLRA]"); Fainblatt, 306 U.S. at 608, 59 S.Ct. 668 ("[T]he test of the Board's jurisdiction is not the volume of the interstate commerce which may be affected, but the existence of a relationship of the employer and his employees to the commerce such that . . . unfair labor practices have led or tended to lead 'to a labor dispute burdening or obstructing commerce.'" (quoting NLRA § 2(7))); Blankenship & Assocs., Inc. v. NLRB, 999 F.2d 248, 250 (7th Cir.1993) (holding that since consultant based in Indiana rendered services to company based in Pennsylvania, "no more was required to put [the consultant's] activities within interstate commerce" and therefore within the Board's statutory jurisdiction under NLRA § 10(a) (citing Reliance Fuel Oil Corp., 371 U.S. at 226–27, 83 S.Ct. 312)).

The jurisdictional argument advanced by ECI in its petition for review rests on an interpretation of NLRA § 10(a) that resembles an interpretation we accepted almost forty years ago in NLRB v. Reliance Fuel Oil Corp., 297 F.2d 94 (2d Cir.1961), rev'd, 371 U.S. 224, 227, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963) (per curiam), but which the Supreme Court decisively rejected when reversing our decision in that very case. In Reliance Fuel Oil Corp., the Board found that Reliance Fuel Oil Corp. ("Reliance"), a New York corporation engaged in the business of selling fuel oil for heating purposes and servicing oil burners and boilers, was engaged in commerce

within the meaning of the NLRA because it had "purchased a substantial amount of fuel oil from Gulf, a company concededly engaged in interstate commerce." *Reliance Fuel Oil Corp.*, 129 NLRB 1166, 1171 (1961). By virtue of Reliance's activities, the Board concluded that "interstate commerce was affected by the Respondent's operations" and, therefore, "that the test of legal jurisdiction has been met." *Id.* Upon finding that Reliance had engaged in unfair labor practices, the Board concluded that those unfair labor practices "tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce, and constitute unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act." *Id.* at 1182. In reaching this conclusion, the Board relied upon an interpretation of NLRA § 10(a) that it repeatedly had invoked in earlier cases, dating almost to the time of the NLRA's enactment. *See, e.g., Bricklayers Local 1 (Osterink Constr. Co.)*, 82 NLRB 228, 236–37 (1949); *Appalachian Mills Co.*, 17 NLRB 764, 766–67 (1939).

On a petition for enforcement of the Board's order, we concluded that the Board had failed to find facts sufficient to establish statutory jurisdiction. *See NLRB v. Reliance Fuel Oil Corp.*, 297 F.2d 94 (2d Cir.1961). While we acknowledged that Congress had legislated to "the full extent of its power under the commerce clause" when it enacted the NLRA, *id.* at 98 (citing *Polish Nat'l Alliance v. NLRB*, 322 U.S. 643, 647, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944)), we rejected the Board's conclusion that any employer that is engaged in commerce and within the Board's discretionary jurisdiction, "if involved in a labor dispute[,] necessarily affects commerce within the meaning of the [NLRA]." *Id.* at 96. Rather, we held that

we may be sure that a reasonably complete picture of the manner in which a work stoppage would affect commerce should be required before we rule on the jurisdictional issue. We cannot tell from the meager record before us anything about the volume of commerce in heating oils in the relevant market, Gulf's participation therein, Reliance's contract relationship, if any, with Gulf's national distribution system, Reliance's proportion of Gulf's commerce in the relevant market, or the number and availability of alternate distributors to Gulf and to Reliance's customers. While volume of commerce affected is not in itself material, such factual findings might well throw light upon the manner in which a [work] stoppage at Reliance would affect commerce, if it all.

*Id.* at 99 (emphasis added). Finding insufficient evidence "on the manner in which a labor dispute at Reliance affects or tends to affect commerce," *id.*, we declined enforcement of the Board's order and remanded the case to the Board for further findings concerning the jurisdictional issue. On consideration of the Board's petition for rehearing, we clarified our holding even further:

> [I]f the employer is himself engaged in interstate commerce, without more the jurisdiction of the Board is established. If the employer is not engaged in interstate commerce, the acts [i.e., the unfair labor practices] in question must lead or tend to lead to a dispute which must burden or obstruct the free flow of interstate commerce.... Had Congress meant to give the Board jurisdiction of all labor disputes involving employers who purchased more than a *de minimis* amount of supplies which had at one time moved in interstate commerce, it would have been easy enough to say so.

*Id.* (denying petition for rehearing).

In a unanimous *per curiam* opinion, the Supreme Court reversed, holding that we

had erred in our interpretation of what was required to establish the Board's jurisdiction under NLRA § 10(a):

> Whether or no[t] practices may be deemed by Congress to affect interstate commerce is not to be determined by confining judgment to the quantitative effect of the activities immediately before the Board. . . . Through the National Labor Relations Act, Congress has explicitly regulated not merely transactions or goods in interstate commerce but activities which in isolation might be deemed to be merely local but in the interlacings of business across state lines adversely affect such commerce. . . . *This being so, the jurisdictional test is met here: the Board properly found that by virtue of Reliance's purchases from Gulf, Reliance's operations and the related unfair labor practices 'affected' commerce, within the meaning of the Act.*

*NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226–27, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963) (per curiam) (citations, internal quotation marks, and alterations omitted and emphasis added). Since then, the Board consistently has relied upon the interpretation of NLRA § 10(a) that it successfully advanced in *Reliance Fuel Oil Corp. See, e.g., 3 State Contractors, Inc.,* 306 NLRB 711, 711 n. 3 (1992); *Skrl Die Casting, Inc.,* 222 NLRB 85, 91 & n. 12 (1976); *Trico Disposal Serv., Inc.,* 191 NLRB 104, 105 (1971); *City Line Open Hearth, Inc.,* 141 NLRB 799, 800–01 (1963).

 The interpretation of NLRA § 10(a) set forth in *Reliance Fuel Oil Corp.* is therefore controlling in this case: by virtue of ECI's engagement in commerce, "[its] operations and the related unfair labor practices 'affected' commerce, within the meaning of [NLRA § 10(a)]." *Reliance Fuel Oil Corp.,* 371 U.S. at 227,

83 S.Ct. 312. While the Board may not have explicitly established "all that could have been proved" with respect to the effect on commerce of the charged unfair labor practices, the Board did prove all that was required to assert jurisdiction under NLRA § 10(a). *Denver Bldg. & Constr. Trades Council v. NLRB,* 186 F.2d 326, 330 (D.C.Cir.1950), *rev'd on other grounds,* 341 U.S. 675, 683–84, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). Because ECI conceded that it was engaged "in commerce" within the meaning of NLRA § 2(6), the Board reasonably concluded that any "threatened or actual stoppage of work" that might result from ECI's unfair labor practices "would in a practical and economic sense adversely affect [ECI's] total business, including its out-of-state" transactions, so as to "affect[ ] commerce" in the sense contemplated by NLRA §§ 2(7) and 10(a). *Id.; see NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 683–84, 71 S.Ct. 943, 95 L.Ed. 1284 (1951) ("[A]ny widespread application of the practices here charged might well result in . . . . labor disputes burdening and obstructing commerce and the free flow of commerce."); *Skrl Die Casting, Inc.,* 222 NLRB at 91 n. 12 (applying *Reliance Fuel Oil Corp.* to conclude that the Board has "no obligation . . . to provide evidence of the individual adverse effect" on commerce of the unfair labor practice alleged, and holding that the Board's finding that an "unfair labor practice affects commerce within the meaning of the Act is adequately supported by the relationship of this case to the many other unfair labor practice cases throughout the country"). Since no intervening Supreme Court decision mandates an interpretation of NLRA § 10(a) different from the interpretation given in *Reliance Fuel Oil Corp., see United States v. Santiago,* 238 F.3d 213, 216 (2d Cir.2001) (per curiam); *cf. California v. FERC,* 495 U.S. 490, 499, 110

S.Ct. 2024, 109 L.Ed.2d 474 (1990) (noting that "[c]onsiderations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done") (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 172–73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)), we have no occasion to apply a different rule in this case.

### B. *Significance of Whether Local 90 Is a "Labor Organization" Within the Meaning of NLRA § 2(5)*

ECI's second jurisdictional challenge questions whether the ALJ properly established that Local 90, the "Charging Party" in this case, is a "labor organization" within the meaning of NLRA § 2(5), 29 U.S.C. § 152(5). The ALJ reached that conclusion based on undisputed testimony from Local 90's organizer that "the Union is an organization made up of electricians and manufacturing employees that provides people in construction and manufacturing a better opportunity through representation, contracts, wages, benefits, and things of that nature." *Electrical Contractors, Inc.*, No 34–CA–8911, 331 NLRB No. 100, slip op. at 1 (internal quotation marks omitted). The ALJ found that testimony sufficient to satisfy the statutory definition, but also took administrative notice of several "prior Board decisions in which the Union has been found to be a labor organization." *Id.* (citing *Electrical Workers Local 90 (Conn. Const.Indus.Assn.)*, 217 NLRB 644 (1975) and *Electrical Workers IBEW Local 90 (SNET)*, 121 NLRB 1061, 1062 (1958)). Without citing any authority in support of its argument, ECI maintains that this evidence is insufficient to establish that Local 90 is, in fact, a "labor organization" as defined in NLRA § 2(5) and, accordingly, that the Board lacked statutory jurisdiction.

However, we fail to see how the question of Local 90's status as a "labor organization" bears any relevance to the question of the Board's statutory jurisdiction. Nothing in the language of the Act limits the Board's jurisdiction to the prevention of unfair labor practices charged by labor organizations or even, more broadly, to labor disputes involving labor organizations. Moreover, the Supreme Court long ago made clear that the identity of the charging party is irrelevant to a determination of whether the Board has jurisdiction. In rejecting the Sixth Circuit's view that only certain types of employees or labor organizations could file charges with the Board, *see NLRB v. Ind. & Mich. Elec. Co.*, 124 F.2d 50, 57 (6th Cir.1941), the Court noted that no restrictions were included on who could file a charge, stating that the NLRA "requires a charge before the Board may issue a complaint, but omits any requirement that the charge be filed by a labor organization or an employee." *NLRB v. Ind. & Mich. Elec. Co.*, 318 U.S. 9, 17, 63 S.Ct. 394, 87 L.Ed. 579 (1943). Hence, the Board's statutory jurisdiction is established regardless of the identity of the "charging party" who brings that practice to the Board's attention.

To the extent that ECI means to argue that Local 90's status as a "labor organization" is relevant to the Board's underlying findings on the merits that ECI had committed unfair labor practices in violation of NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), ECI has arguably waived any such claim. Before the Board, ECI asserted an exception to the ALJ's finding that Local 90 was a labor organization only with respect to the jurisdiction of the Board, not as to the ALJ's findings on the merits of the action. *See* NLRA § 10(e), 29 U.S.C. § 160(e) ("No objection that has

not been urged before the Board, its member, agent, or agency, shall be considered by the court...."); *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 666, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982); *but see May Dep't Stores Co. v. NLRB,* 326 U.S. 376, 386 n. 5, 66 S.Ct. 203, 90 L.Ed. 145 (1945). However, even assuming that the argument is not waived and that Local 90's status as a "labor organization" were relevant in some manner,[4] the Board's finding was supported by substantial evidence when considering the record as a whole. The activities of Local 90 generally, and especially in the context of this particular case, are paradigmatically the activities that "labor organizations" undertake. And while ECI makes much of the fact that the entity primarily involved in the effort to organize and represent the ECI workforce was not a union, but CLMCC, a joint labor-management committee, ECI's response to that organizing effort *itself* constitutes evidence of either Local 90's or CLMCC's role as a "labor organization." The antiunion letters that ECI circulated to its employees make clear that ECI itself believed that CLMCC had strong connections to some union. Moreover, Local 90 itself played an independent role as part of the effort to organize the ECI workforce.

## II. The Board's Exercise of Its Remedial Authority Under NLRA § 10(c)

 ECI maintains that the Board exceeded its remedial authority under NLRA § 10(c), 29 U.S.C. § 160(c) by ordering ECI to

> [n]otify the State Labor Commissioner, the State Department of Transportation, the Towns of Hamden and West Hartford, and any other entities to which the Respondent sent copies of the unlawfully solicited letters that those letters are null and void and to be given no effect by these parties.

*Electrical Contractors, Inc.,* No 34–CA–8911, 331 NLRB No. 100, slip op. at 7; ECI argues that this particular aspect of the Board's order infringed upon the rights of ECI's employees to freedom of speech and expression under both the First Amendment and the NLRA,[5] and

---

**4.** We note our doubts as to whether that issue would, in fact, be relevant to the merits in this case, for the unfair labor practices at issue under NLRA § 8(a)(1) concern ECI's alleged interference and coercion not only with the employees' right to "form, join, or assist *labor organizations,*" but also their other rights under NLRA § 7, which include "the right to self-organization," "to bargain collectively through representatives of their own choosing," and "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection"—none of which explicitly requires the involvement of a "labor organization" as defined in the Act. NLRA §§ 7 & 8(a)(1), 29 U.S.C. §§ 157 & 158(a)(1).

**5.** The statutory aspect of ECI's argument is premised on two provisions of the Act: (1) NLRA § 7, which protects the rights of employees not only to engage in concerted labor activities, but in most circumstances also to *refrain* from involvement in such activities, *see*

NLRA § 7, 29 U.S.C. § 157; and (2) NLRA § 8(c), which provides that

> [t]he expressing of ANY views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this [Act], if such expression contains no threat of reprisal or force or promise of benefit.

NLRA § 8(c), 29 U.S.C. § 158(c). As the Board correctly argues, however, ECI's reliance on NLRA § 8(c) is misplaced, for that provision only protects ECI's own speech or expression from being used by the Board as evidence of the unfair labor practices alleged to have been committed by ECI in this case. Section 8(c) of the NLRA does not prevent the Board from determining, as it did in this case, whether the statements attributed to ECI's employees in the letter distributed by ECI for their signature might have been the product

thereby exceeded the statutory authority granted to the Board under NLRA § 10(c) to issue orders requiring such action "as will effectuate the policies of [the NLRA]." Implicit in ECI's argument is the assertion that the letters signed by its employees constituted the protected speech of those employees. By ordering ECI to declare those letters null and void, ECI argues, the Board effectively has compelled those employees to engage in speech without their consent, since none of the ECI employees who signed the letters "ever ask[ed] that they be withdrawn or retracted, in whole or in part." Br. for Petitioner at 13.

◼◼◼◼◼ Because of the Board's "unique expertise in labor disputes" and its broad statutory discretion to fashion remedies for violations of the NLRA, the particular remedy selected by the Board "is subject to limited judicial review, and 'will not be overturned if it may fairly be said to have as its purpose ends that will effectuate the policies of the Act.'" *NLRB v. Coca–Cola Bottling Co. of Buffalo, Inc.*, 191 F.3d 316, 323–24 (2d Cir.1999) (quoting *Manhattan Eye Ear & Throat Hosp. v. NLRB*, 942 F.2d 151, 156 (2d Cir.1991)); *see* NLRA § 10(c), 29 U.S.C. § 160(c) (1994) (authorizing the Board to issue orders requiring such action "as will effectuate the policies of [the NLRA]"). We refrain from disturbing the Board's remedial order unless it can be shown that the order constitutes "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943).

◼◼◼ As with its challenges to the Board's jurisdiction, our consideration of the arguments that ECI presents here is limited to review of the Board's exercise of its remedial authority under NLRA § 10(c) itself. To the extent that ECI means to challenge the underlying merits of the Board's findings that ECI had engaged in unfair labor practices, any such claims have been waived by ECI's failure to assert those arguments in its exceptions before the Board. *See* NLRA § 10(e), 29 U.S.C. § 160(e); *KBI Sec. Serv., Inc.*, 91 F.3d 291, 294 (2d Cir.1996). And while ECI frames this argument as one challenging the Board's exercise of its remedial authority, its argument depends to a considerable extent upon a challenge to the Board's underlying finding on the merits that the letters in question did not constitute the freely expressed views of ECI's employees, but instead were the product of unlawful coercion and intimidation of those employees in the exercise of their rights under NLRA § 7. Having failed to assert any such claim in its exceptions before the Board, ECI has waived its opportunity to challenge the Board's conclusion that ECI coerced its employees to sign the antiunion letters in violation of NLRA § 8(a)(1).[6]

---

of unlawful coercion, rather than the freely expressed views of those employees.

**6.** In any event, that conclusion is amply supported by substantial evidence when considering the record as a whole. ECI's conduct was not found in violation of NLRA § 8(a)(1) simply by virtue of it having drafted and distributed a letter for its employees to sign and deliver to Connecticut officials concerning the disclosure of employees' personal information. Rather, as the ALJ concluded, ECI went further and crossed the line between permissible and impermissible communication with its employees. By distributing these letters at employees' worksites and asking them to sign in the presence of their supervisors and then by collecting the signed letters, [ECI] engaged in conduct that could reasonably have led employees to believe that they were at peril if they refrained from signing it.... Moreover, the fact that the Respondent collected the letters ... indicates an attempt by [ECI] to

Using that conclusion on the merits as the starting point of our analysis, as we therefore must, we agree with the Board that its order requiring ECI to declare those letters null and void is well within the Board's remedial authority, since it focuses precisely on negating the effects of ECI's misrepresentation that the letters reflected the uncoerced and freely expressed views of its employees. In this regard, we disagree with ECI's assertion that the Board's order requires ECI to nullify the freely expressed views of its employees against their will, for the Board's underlying decision on the merits makes clear that the letters did not at all constitute free speech by ECI's employees, but instead were the product of ECI's coercive conduct. It necessarily follows that requiring those letters to be nullified does not affect any rights of ECI's employees under the First Amendment or the NLRA—to the contrary, the order restores the ability of ECI's employees to engage in speech and expression free from the coercive influence of their employer's conduct. Since it cannot be said that the Board's remedial order seeks to advance "ends other than those which can fairly be said to effectuate the policies of the Act," *Virginia Elec. & Power Co.*, 319 U.S. at 540, 63 S.Ct. 1214, we affirm that order as a reasonable exercise of the Board's discretion under NLRA § 10(c), 29 U.S.C. § 160(c).

## CONCLUSION

We conclude that the Board properly asserted jurisdiction under NLRA § 10(a) and that its remedial order constituted a proper exercise of its authority under NLRA § 10(c). To the extent that ECI means to challenge the merits of the Board's findings, it has failed to preserve any such challenge for appellate consideration. Accordingly, we DENY the petition filed by ECI and GRANT the Board's cross-petition for enforcement of its order.

---

determine whether the employees chose to avail themselves of this opportunity to stop the "union harassment."

*Electrical Contractors, Inc.*, No 34–CA–8911, 331 NLRB No. 100, slip op. at 6. The ALJ also noted that by attributing to its employees the various antiunion statements that were included in the letter, the language of the letter itself "belies the true purpose behind [ECI's] conduct, i.e., to poll its employees to ascertain the extent of employee interest in unionization." *Id.* Especially given the direct and substantial role played by ECI and its management in drafting the precise language of the letter and circulating that letter for signature,, substantial evidence supports the Board's findings that the letters were the product of coercive conduct by ECI and its management, rather than the free expression of its employees' views. *Cf. NLRB v. J.L. Brandeis & Sons*, 145 F.2d 556, 567–68 (8th Cir.1944) (finding no employer coercion in connection with circulation of antiunion petition in workplace during business hours based on explicit finding that "[t]here is no evidence that the respondent was directly responsible for the drafting and circulating" of that petition).